2007 WY 127

**Shane SANDERSON, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

**No. 06–14.**

Supreme Court of Wyoming.

Aug. 6, 2007.

Representing Appellant: Michael J. Krampner, of Krampner, Fuller & Hambrick, Casper, Wyoming.

Representing Appellee: Patrick J. Crank, Attorney General; Paul Rehurek, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; David Delicath, Senior Assistant Attorney General. Argument by Mr. Delicath.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Appellant, Shane Sanderson, appeals his conviction for one count of immodest, immoral, or indecent acts with a child ("indecent liberties"), and two counts of felony child abuse. He argues that the trial court improperly admitted character evidence against him, that the indecent liberties statute is unconstitutional as applied to his conduct, that prosecutorial misconduct deprived him of a fair trial, and that there was insufficient evidence to sustain his child abuse convictions. We affirm.

### ISSUES

[¶ 2] We rephrase the issues as follows:

1. Was improper character evidence admitted in violation of W.R.E. 404(a)?

2. Is the indecent liberties with a minor statute, Wyo. Stat. Ann. § 14–3–105(a) unconstitutional as applied to Mr. Sanderson's conduct?

3. Did the prosecutor commit misconduct during closing and rebuttal arguments?

4. Was there sufficient evidence of "physical injury" to sustain the felony child abuse convictions?

### FACTS

[¶ 3] On February 13, 2005, while the rest of the family was upstairs, Mr. Sanderson took one of his children, AS, downstairs and gave her a tube of K–Y Jelly. AS was fourteen at the time. He said that it would help relieve her constipation, and that he would tell her how to use it later. He did not mention this to anyone else in the family,

including Mrs. Sanderson. Two days later, AS told her mother that Mr. Sanderson had rubbed her anal area with K–Y Jelly for about ten minutes in the bathroom the previous night. AS also told her mother that, after the incident in the bathroom, Mr. Sanderson had taken her into her bedroom and massaged her back while "inching down her pants and underwear." Mrs. Sanderson became angry that Mr. Sanderson had given K–Y Jelly to AS without Mrs. Sanderson's knowledge. She was also angry about the incidents in the bathroom and bedroom. She said that AS was too old for Mr. Sanderson to be engaging in that kind of behavior with her.

[¶ 4] After AS disclosed these events, Mrs. Sanderson took her children to her mother's house. Mrs. Sanderson's mother called the county prosecutor and reported that AS may have been sexually abused. The prosecutor then asked the Johnson County Sheriff's Department and the Department of Family Services (DFS) to investigate.

[¶ 5] Sheriff's deputies and the DFS caseworker interviewed Mrs. Sanderson, who told them what AS had said about the incidents in the bathroom and bedroom. The investigators also interviewed the children. AS described the incidents of the previous evening. She also related that Mr. Sanderson had once put automotive starting fluid on a rag and forced her to inhale the fumes to the point that she became ill, and that he later did the same thing to her sister, TS. TS, who was twelve years old at the time, confirmed that her father had exposed her to starting fluid, and said that he put the fluid-saturated cloth in a plastic bag before forcing her to inhale the fumes. TS reported that she became ill, vomited, and missed school that day. AS and TS also told the officers about a number of Mr. Sanderson's other behaviors, such as inspecting AS's genitalia, purportedly to look for ticks, but in such a way as to make AS uncomfortable. They also said that he routinely walked into the bathroom when AS was occupying it, became angry if she locked the bathroom door, and often demanded that AS remove her shirt and show him the bra she was wearing.

[¶ 6] Three and a half weeks after the initial report, AS and TS were separately interviewed and evaluated by a counselor at the DFS caseworker's request. In addition to the free-form interviews, the counselor administered several standardized psychological tests. Those tests indicated that both AS and TS tended to conform to others' expectations and were submissive. The tests also revealed that the two sisters both feared rejection and were insecure.

[¶ 7] Approximately two months after the initial report, officers arrested Mr. Sanderson and charged him with two counts of felony indecent liberties with a child in violation of Wyo. Stat. Ann. § 14–3–105(a)[1] and two counts of felony child abuse in violation of Wyo. Stat. Ann. § 6–2–503(b).[2] The indecent liberties charges were based on the bathroom incident and the bedroom incident. The child abuse charges were based on the starting fluid incidents.

[¶ 8] At trial, the prosecutor first called TS and AS to the stand and, after two other

---

1. Wyo. Stat. Ann. § 14–3–105(a) (LexisNexis 2003):

   Except under circumstance[s] constituting sexual assault in the first, second or third degree as defined by W.S. 6–2–302 through 6–2–304, any person knowingly taking immodest, immoral or indecent liberties with any child or knowingly causing or encouraging any child to cause or encourage another child to commit with him any immoral or indecent act is guilty of a felony. . . .

2. Wyo. Stat. Ann. § 6–2–503(b) (LexisNexis 2003):

   Except under circumstances constituting a violation of W.S. 6–2–502 [aggravated assault], a person is guilty of child abuse, a felony punishable by imprisonment for not more than five (5) years, if a person responsible for a child's welfare as defined in W.S. 14–3–202(a)(i) intentionally or recklessly inflicts upon a child under the age of eighteen (18) years:

      (i) Physical injury as defined in W.S. 14–3–202(a)(ii)(B), excluding reasonable corporal punishment[.]

   Wyo. Stat. Ann. § 14–3–202(a)(ii)(B) (LexisNexis 2003): " 'Physical injury' means any harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising if greater in magnitude than minor bruising associated with reasonable corporal punishment, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition[.]"

witnesses, Mrs. Sanderson. All three testified that they had lied, overreacted, or exaggerated in their earlier statements to investigators. In an effort to mitigate possible damage to the State's case because of the recantations, the prosecutor asked other witnesses, including Mrs. Sanderson's mother, two sheriff's officers, the DFS caseworker, and the counselor who had evaluated AS and TS, to describe their recollections of the prior statements of AS, TS, and Mrs. Sanderson. The counselor also testified about dynamics of incestuous families and, more specifically, about recanting behavior in child victims of sexual abuse. The State also presented audio recordings of AS's and TS's interviews with the deputies and the DFS caseworker. Those interviews took place during the first few days after the initial report.

[¶ 9] Mr. Sanderson did not dispute that the bathroom incident with AS had occurred. His defense theory was that his actions were for the health-related purpose of helping to relieve her constipation. He claimed that AS and TS asked him if they could smell the starting fluid, and he contended that any ill effects were short-lived and harmless, and so did not meet the statutory definition of "physical injury" stated in Wyo. Stat. Ann. § 14–3–202(a)(ii)(B).

[¶ 10] The jury convicted Mr. Sanderson of one count of indecent liberties, corresponding to the bathroom incident, and both counts of felony child abuse. It acquitted him on the second indecent liberties count, corresponding to the bedroom incident. The trial court sentenced Mr. Sanderson to 13–18 months imprisonment for each child abuse conviction, and 6–8 years imprisonment for the indecent liberties conviction. The court ordered that all prison terms be served concurrently, and suspended all imprisonment in favor of 4–6 years of intensive supervised probation. Mr. Sanderson now appeals his convictions.

## *DISCUSSION*

### Character Evidence

[¶ 11] Mr. Sanderson asserts that the counselor's descriptions of the victims as "compliant," their mother as "sickly," and Mr. Sanderson as "domineering," as well as the counselor's testimony about typical patterns of incestuous families, constituted impermissible character evidence. W.R.E. 404(a) provides that "[e]vidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion." Mr. Sanderson argues that the counselor's testimony should have been excluded under W.R.E. 404(a) because it was "irrelevant for any purpose other than showing that [he] was ... the kind of dad who would molest his daughter."

[¶ 12] The parties dispute the proper standard of review. Mr. Sanderson contends that he made a proper objection to the relevant testimony. The State argues that while Mr. Sanderson made some objections, he did not object to the specific testimony he now contends was error, and further, that the objections he did make were not on the same basis that he presents on appeal. Under Mr. Sanderson's view, we review admission of evidence for abuse of discretion. *Sanchez v. State*, 2006 WY 116, ¶ 20, 142 P.3d 1134, 1140 (Wyo.2006). Under the State's argument, we review for plain error. *Talley v. State*, 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo.2007).

[¶ 13] Where "the objection was not originally made on the ground now urged, the argument is without force.... The objector should lay his finger on the particular point intended to be raised so that the trial court will have notice and an opportunity to cure the alleged error." *Valerio v. State*, Wyo., 429 P.2d 317, 319 (1967) (quoting *Murdock v. State*, Wyo., 351 P.2d 674, 679 (1960)). "[I]t is incumbent upon the complaining party to point out with definiteness and particularity the error of which he complains, so that the trial court may pass upon the exact question" to be later reviewed. *Valerio*, 429 P.2d at 319. As a result, we must determine whether Mr. Sanderson objected to the contested testimony in a way that put the improper character evidence issue before the trial court.

[¶ 14]   The defense made many objections to the counselor's expected trial testimony throughout the pretrial process, but none were based on W.R.E. 404(a).   The primary argument, among others also not asserted on appeal, was that "what really we are ending up into is a Daubert motion."   The reference is apparently to *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), a seminal case involving the proper scientific foundation of expert testimony.   At trial, Mr. Sanderson also contended that a portion of the counselor's testimony was impermissible vouching. In support of his objection at trial, defense counsel heavily relied on our decisions in *Hannon v. State,* 2004 WY 8, 84 P.3d 320 (Wyo.2004), and *Seward v. State,* 2003 WY 116, 76 P.3d 805 (Wyo.2003).   These cases do not involve character evidence and are not relevant to the issue presented on appeal.

[¶ 15]   At trial, defense counsel did not object to the counselor's testimony regarding the standardized tests and the results.   The results supported the counselor's opinion that AS and TS were submissive and passive. Defense counsel did object, however, to testimony about how AS and TS perceived their father.   The trial court initially sustained an objection to the testimony based on lack of foundation.   When questioning resumed, defense counsel continued to object as the prosecutor laid the foundation and successfully elicited an answer, then asked about dynamics of a typical incestuous family.   Defense counsel founded each objection on some combination of "continuing objection" and lack of foundation.   While the context makes it difficult to determine what precisely the "continuing objection" was, it is apparent that Mr. Sanderson never articulated any improper character evidence basis for his objections. It is also apparent that the court's rulings were based on whether there was proper foundation for the testimony.

[¶ 16]   Our careful review of the record, including what we have set out above, shows that Mr. Sanderson made no argument, and did not give the trial court notice, that his objection to the counselor's testimony was on the basis that it was inadmissible character evidence.   The trial court had no opportunity to cure any error, much less rule on the exact question Mr. Sanderson now brings.   As a result, we review his claim for plain error.   This standard requires the alleged error 1) be clearly reflected in the record, 2) be a violation of a clear and unequivocal, not merely arguable, rule of law, and 3) deny an appellant a substantial right resulting in material prejudice.   *Martin v. State,* 2007 WY 76, ¶ 22, 157 P.3d 923, 928 (Wyo.2007).

[¶ 17]   We note that the counselor never testified that Mrs. Sanderson was "sickly." The record reveals that it was the prosecutor, in closing argument, who described Mrs. Sanderson as sickly.   Because Mr. Sanderson's argument here incorrectly treats the prosecution's argument as evidence, we will not further analyze this particular point. For the remaining allegations of error, there is no dispute that the record clearly reflects the testimony at issue, so our analysis begins with whether Mr. Sanderson has demonstrated a violation of an unequivocal rule of law.

[¶ 18]   Mr. Sanderson argues that the trial court improperly admitted testimony he considers inadmissible character evidence.   Character evidence "is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion."   W.R.E. 404(a).   We have previously said that "character evidence means proof relating to commonly-recognized human qualities that might be called innate or essential to the person being described."   *Brown v. State,* 953 P.2d 1170, 1176 (Wyo.1998).   It is impermissible to use that quality as evidence that a defendant "acted in conformity therewith."   W.R.E. 404(a); *e.g., Ryan v. State,* 988 P.2d 46, 53–57 (Wyo.1999).   Character evidence is not admissible "when the only relevance of the testimony is to show a defendant's bad character."   *Brown,* 953 P.2d at 1177.   We have previously recognized, however, that expert testimony, in certain circumstances, is admissible to explain victim behavior.   *E.g., Ryan,* 988 P.2d at 54. As such, we have held that it does not implicate the proscription against character evidence.   *Frenzel v. State,* 849 P.2d 741, 748 (Wyo.1993); *Ryan,* 988 P.2d at 55 ("Expert

testimony [that] relates to the victim is entirely proper.").

[¶ 19] Applying the basic principles in the area of child sexual abuse, we have previously held that "[Child Sexual Abuse Accommodation Syndrome] evidence is relevant and admissible to dispel myths the public might hold concerning a child sexual abuse victim's post-abuse behavior if that behavior is an issue in the case." *Frenzel,* 849 P.2d at 749. "For example, if the facts of a particular case show that the victim . . . recanted the allegations, . . . then testimony about that particular characteristic of CSAAS would be admissible to dispel any myths the jury may hold concerning that behavior." *Id.*

[¶ 20] Our cases are not limited to those in which experts have attached the label of a "syndrome" to the victim's behavior. In *Triplett v. State,* 802 P.2d 162 (Wyo.1990), we affirmed the denial of the defendant's motion to withdraw his guilty plea. The victim in the case had recanted her previous accusation, so the defendant moved to withdraw his guilty plea. *Id.* at 163. The prosecutor presented the testimony of a professional counselor who had worked with victims of child sexual abuse in the motion hearing. The expert explained, among other things, "the dynamics of recantation of accusations of sexual abuse by victims." *Id.* at 165. We held the testimony was proper. *See also Rivera v. State,* 840 P.2d 933, 938–939 (Wyo.1992) (several witnesses, including a clinical psychologist, discussed typical sexual assault victim behavior).

[¶ 21] Here, the record demonstrates that the victims' recantation of prior statements was a prominent issue at trial. TS was the first witness in the State's case in chief. When the prosecutor asked about her response to investigators when asked whether Mr. Sanderson was acting inappropriately with her, TS's reply was, "I said yes, but I was lying." When asked whether she reported that her father had made her smell starting fluid, TS replied, "Yes, but I was—I was extending the truth." When asked about her statements to investigators concerning the starting fluid, she said that she was "pretty sure [she] was just trying to make it sound worse than it really was." TS even admitted that her testimony was suspect: "I know it looks really bad because my stories have changed."

[¶ 22] The recantation issue arose again during cross examination. TS, when asked if she was changing her story because she wanted to please her father, replied, "No, because I actually learned the truth about everything." Later, she said that "[at the time of the initial investigation] I wasn't quite sure what all happened, and right now I've heard all of the stories, and I'm sure that my answers now are true." At the end of her redirect examination, TS admitted that she had heard her father's side of the story from her mother.

[¶ 23] AS testified next, and also discussed her prior statements. She claimed that she had lied in her initial report to investigators. When asked why, she said, "I was scared of—I don't know. I was angry at myself, and I guess I didn't want to make myself look bad, so I made it look worse than it really was." When asked why she lied then changed her mind, she said, "Because I had my mind set on what I said and then afterward, after I thought about what I was getting myself into, it wasn't worth lying over. I could just tell the truth." She also testified she had decided to tell the truth only days after she initially lied to investigators. In spite of this decision, she admitted repeating her purportedly false story to the counselor several weeks after the initial report. Throughout her testimony, she variously claimed that she "over exaggerated," because "I didn't want to look bad," and "to make myself look better."

[¶ 24] Mrs. Sanderson testified several times that she had lied in her prior statements to investigators and the counselor, and that the reason was "[t]o save my pride, I guess." Furthermore, Mrs. Sanderson admitted talking to Mr. Sanderson after the initial reports and, when learning his side of the starting fluid story, discussing it with the children, who then "remembered" events in a way that matched that story. Her testimony prompted the trial court to remark, out of the jury's presence, that "[t]his witness has got the worst credibility problem of anybody I have ever seen."

[¶ 25] The counselor's testimony describing AS and TS as "compliant" does not violate W.R.E. 404(a). The testimony related directly to the victims, not Mr. Sanderson. Similarly, the counselor's testimony regarding the victims' perception of Mr. Sanderson does not implicate his character. The prosecutor asked the counselor several prefatory questions that clarified in no uncertain terms that she had not seen or spoken with Mr. Sanderson, nor did she have any particular opinion of him. The victims' perception of their father was important in explaining their behavior, not his. Under the circumstances, the testimony about AS and TS does not violate W.R.E. 404(a).

[¶ 26] The statement regarding typical incestuous families is a more difficult question. The challenged testimony was as follows:

Q. [By the Prosecution] And is there in— from your training and experience and research, is there—are there I guess, what I will call inarticulately, stereotypical dynamics for families where there is molestation of the children?

. . .

A. Oft times there is a dominant abuser who may use intimidation, threats, perhaps even violence to command family obedience. It's possible that he physically abuses children. Perhaps batters his wife. His family may keep such abusive behavior secretive. They may fear the consequences of exposing him, and they fear what the ramifications of outside intervention might be, even more than they fear the continuation of the behavior itself. He himself may be very charming, outgoing, well received by peers, and so there might be a sharp contrast to his public façade that is quite engaging where at home he has a reign of terror.

Also it's common that there are instances where the mother in such a family might have been a victim of sexual abuse herself. Oftentimes the children will recant that any abuse took place, and sometimes we will see it in cases where there is an illness within the spouse or the partner leading to less emotional availability of her to deal with the children.

[¶ 27] After this answer, the prosecutor asked more detailed questions about recantation in particular:

Q. Let me ask you about—you said the word recant. What does that word mean to you?

A. To make allegations initially, and then retract them and say that the abuse did not occur.

. . .

Q. Have you done any research into frequency of recantation in children who initially allege that they have been sexual[ly] abused?

A. Yes.

Q. Can you tell what that research is?

A. Yes, in a book by John Meyers (phonetic), he cites a study conducted by Sorenson and Snow. They studied 116 cases of confirmed abuse; 22 percent recanted or later retracted those allegations, and of those 22 percent who recanted, 92 percent reaffirmed the allegation over time.

Q. Okay, what does that mean, reaffirm the allegation over time?

A. That means that after further study, those 22 percent who said no, no, no, it did not happen, came back and said, you know, what, I was telling the truth to begin with; it really did happen.

. . .

Q. In your experience with Blanchard and Associates, have you worked with children who recanted?

A. Yes.

Q. And have any of those children later reaffirmed the allegation?

A. Yes.

[¶ 28] One inference to be drawn from the challenged testimony is that it was about Mr. Sanderson and was used for impermissible purposes, violating our rule in *Ryan*. On the other hand, the context also indicates that the testimony, as in *Frenzel* and *Triplett*, simply explained why the victims and their mother changed their stories and ultimately recanted. If so, the information was potentially useful to help the jury decide what to make of the various excuses for the changing stories, and to give background to help the

jurors decide whether the courtroom version was the truth. This is distinguishable from the situation in *Ryan*, where we held that there was no other purpose for the testimony at issue. 988 P.2d at 55; *see also Skinner v. State*, 2001 WY 102, ¶ 30, 33 P.3d 758, 768 (Wyo.2001) (no other purpose for testimony describing typical domestic violence abuser).

[¶ 29]   In light of the recantations at issue in Mr. Sanderson's trial, the testimony that put those recantations squarely before the jury, and the expert's value to the jury in explaining the victims' behavior, Mr. Sanderson has not convinced us that the testimony was impermissible character evidence presented solely to establish that he was "the kind of dad who would molest his daughter." As there was a permissible purpose for the evidence, we cannot say that its admission was a violation of a clear and unequivocal rule of law.

### As–Applied Constitutional Challenge

[¶ 30]   Mr. Sanderson asserts that the indecent liberties statute is unconstitutionally vague as applied to his conduct. The statute in question prohibits any person from "knowingly taking immodest, immoral or indecent liberties with any child." Wyo. Stat. Ann. § 14–3–105(a). To survive constitutional challenge, a penal statute like this must define the offense so that ordinary people can understand what conduct is prohibited. *Griego v. State*, 761 P.2d 973, 975 (Wyo. 1988). "It is well settled that the indecent liberties statute is not facially unconstitutional." *Rabuck v. State*, 2006 WY 25, ¶ 15, 129 P.3d 861, 864 (Wyo.2006). In considering Mr. Sanderson's challenge that the statute is unconstitutional as applied, we focus on his specific conduct, and answer the basic question of "whether the statute provides sufficient notice to a person of ordinary intelligence" that this specific conduct was illegal. *Id.*, ¶ 16, 129 P.3d at 865 (quoting *Lovato v. State*, 901 P.2d 408, 412 (Wyo.1995)).

[¶ 31]   We begin with a strong presumption that the statute is constitutional. *Giles v. State*, 2004 WY 101, ¶ 10, 96 P.3d 1027, 1030 (Wyo.2004). As a purely legal question, this constitutional issue is considered *de novo*. *Rabuck*, ¶ 13, 129 P.3d at 864.

However, we defer to the jury's guilty verdict, and give the State every factual inference in its favor that may be fairly drawn from the record. *Id.* Again, in considering whether a statute is vague as applied, we evaluate the statute "solely in light of the complainant's specific conduct." *Giles*, 96 P.3d at 1031 n. 2.

[¶ 32]   The specific conduct at issue here was Mr. Sanderson's massaging of AS's anal area with KY jelly. He did this, he claims, to help relieve AS's constipation. He asserts that this conduct was health-related, and not for sexual purposes. Accordingly, he argues that the statutory prohibition against "immodest, immoral or indecent liberties" did not provide sufficient notice that his conduct was criminal.

[¶ 33]   The fundamental flaw in Mr. Sanderson's argument is that he asserts only those facts favorable to his defense, and only the evidence suggesting a health-related purpose for his conduct. The applicable standard of review, as set forth above, requires us to consider the facts and inferences most favorable to the prosecution. In finding Mr. Sanderson guilty, the jury apparently rejected Mr. Sanderson's explanation. There is ample evidence in the record to support that decision.

[¶ 34]   Additionally, the record includes evidence that Mr. Sanderson did, in fact, understand that his conduct was prohibited. We have recognized that a defendant's consciousness of guilt indicates knowledge that the conduct was prohibited. *See, e.g., Sorenson v. State*, Wyo., 604 P.2d 1031, 1035 (1979) (defendant asked the twelve-year-old girl, "you won't tell anybody, will you?"); *Rabuck*, ¶ 20, 129 P.3d at 866 (defendant disposed of video receiver when he learned that the camera had been discovered). In this case, when Mr. Sanderson gave the K–Y Jelly to AS, he took her downstairs, away from the rest of the family. He did not tell Mrs. Sanderson of the gift, nor of his conduct with AS. It was fair for the jury to infer from the evidence that Mr. Sanderson deliberately tried to keep his conduct secret. His "efforts to conceal his conduct indicate his understanding that his conduct was unlawful." *Id.*

[¶ 35] Mr. Sanderson argues that our prior decisions applying this statute failed to provide sufficient notice that his conduct was prohibited. Mr. Sanderson is correct that none of our prior cases have involved conduct identical to his. However,

the lack of prior cases discussing similar conduct is not determinative.... [T]he indecent liberties statute should not be subject to challenge by virtue of the fact that it is broad enough to capture even innovative forms of sexual imposition on minors. The indecent liberties statute has been a part of Wyoming law for nearly five decades and we have uniformly given it broad application. *Schmidt [v. State,* 2001 WY 73, ¶ 27, 29 P.3d 76, 84–85 (Wyo.2001)].

*Rabuck,* ¶ 19, 129 P.3d at 866 (quotation marks omitted). We have previously defined the term "indecent liberties" as actions "the common sense of society would regard as indecent and improper." *Pierson v. State,* 956 P.2d 1119, 1123 (Wyo.1998). Viewing the evidence in the light most favorable to the State, it is impossible not to conclude that the common sense of society would regard Mr. Sanderson's conduct as "immodest, immoral or indecent," and therefore prohibited under the statute. Mr. Sanderson's arguments do not overcome the strong presumption of constitutionality, and we conclude that Wyo. Stat. Ann. § 14–3–105(a) is not unconstitutional as applied to Mr. Sanderson.

## Prosecutorial Misconduct in Closing and Rebuttal Arguments

[¶ 36] Mr. Sanderson argues that the prosecutor's statement that the victims' stories "held up with law enforcement under detailed analysis" was reversible error because the statement is improper vouching for witnesses' credibility. He also argues that the prosecutor's statement, "[i]f you're acting appropriately with your child, then you don't have to defend yourself," improperly shifted the burden of proof to the defendant. The State argues that the statements were not improper in context. After carefully reviewing the record, we agree with the State.

[¶ 37] When reviewing allegations of prosecutorial misconduct, we first evaluate the prosecutor's actions within the context of the entire record and the argument as a whole. *E.g., Talley,* ¶ 9, 153 P.3d at 260. In Mr. Sanderson's case, he did not object to the two comments he now alleges were misconduct. He must therefore demonstrate plain error. In general, we are reluctant to find plain error in closing arguments lest "the trial court become[ ] charged with an adversary responsibility to control argument even when objection is not taken by the opposing attorney." *Farmer v. State,* 2005 WY 162, ¶ 26, 124 P.3d 699, 709 (Wyo. 2005) (quoting *Harper v. State,* 970 P.2d 400, 403 (Wyo.1998)).

[¶ 38] Several of our prior cases are instructive for our analysis of the first statement, that the victims' initial stories "held up with law enforcement under detailed analysis." In *Metzger v. State,* 4 P.3d 901, 911–12 (Wyo.2000), the prosecutor argued that the parents of a child victim believed their daughter's story. The defense's theory was that the mother had forced her daughter to make up allegations of sexual abuse. *Id.* We held that "the argument, in context, [was] a fair response to the defense's theory of the case," and did not inappropriately vouch for the veracity of the daughter. *Id.* at 912. In *Moe v. State,* 2005 WY 58, ¶ 18, 110 P.3d 1206, 1213 (Wyo.2005), the prosecutor made statements that superficially seemed improper: "Clearly, I think there is tons of evidence that an indecent liberty occurred here. Everybody agrees that it's an indecent liberty." We held that this and other statements were not misconduct because "[t]he prosecutor did not directly state that it was his opinion that the witnesses were credible nor did he give that impression or suggest that the jurors still did not have that determination to make. No personal guarantees were made about the prosecutor's personal beliefs concerning the facts." *Id.,* ¶ 22, 110 P.3d at 1215.

[¶ 39] Mr. Sanderson's argument is based on several other cases in which we have held admission of vouching testimony to be reversible error. In *Wilde v. State,* 2003 WY 93, ¶¶ 16–19, 74 P.3d 699, 708–09 (Wyo.2003), for example, we held that there was reversible error where several people testified in depth that they believed the child victim's

story. This testimony was extensive, comprising three witnesses—two of them experts—who were squarely asked if they believed the child. *Id.*

[¶ 40] In Mr. Sanderson's case, after examining the prosecutor's statement in context, we conclude that his comment about the victims' stories withstanding law enforcement scrutiny was not misconduct. Mr. Sanderson's defense relied heavily on the proposition that his wife and daughters had previously exaggerated or lied to the authorities, but finally told the truth at trial. The State's case, on the other hand, depended on the proposition that the trial testimony was both coerced and, being later in time, more likely to be a lie. The full context of the prosecution argument is as follows:

> ... I submit to you that unlike another criminal case where you get—where you get a person on the stand and it appears that there are issues about their testimony—to put it politely—unlike those cases, we are dealing with kids. And you have got to think in your heart, in your mind, why these poor girls would have to get up there and tell these lies. Why do they have to do that? Because it's no big deal to their mom. And their dad is not going to protect them, and their mother told them, look, I'm going to die if we don't have dad's insurance. I'm going to die if I can't get money from dad to get medical insurance, and [TS] told that—excuse me. [TS] told that in a tearful fashion to [the counselor]. She really believed that, and she believed it when she got up here to testify on Tuesday. And somehow the defense has to deal with that. Somehow they have to deal with why these girls would have told these stories to law enforcement. Why these stories would have held up with law enforcement under detailed analysis. Why they would have told the same thing to a counselor they went to. Why would they have done that? They have to say it's because somebody had an agenda.

The prosecutor's statement was simply part of his argument that the children's initial statements were more credible than those at trial. He was pointing out that the stories remained consistent through several retellings to law enforcement and, weeks later, to the counselor. The prosecutor never said that he believed the girls' earlier stories and not their later testimony. "No personal guarantees were made about the prosecutor's personal beliefs concerning the facts." *Moe,* ¶ 22, 110 P.3d at 1215. Viewed in this context—particularly given the defense theory of the case—the prosecutor's argument did not constitute misconduct.

[¶ 41] Next we turn to the prosecutor's statement that "[i]f you're acting appropriately with your child, then you don't have to defend yourself." In *Condra v. State,* 2004 WY 131, ¶¶ 9, 16–18, 100 P.3d 386, 389, 390–91 (Wyo.2004), on which Mr. Sanderson relies heavily, we reversed Mr. Condra's conviction in part because the prosecutor stated in closing arguments that "[i]f what Mr. Condra did wasn't wrong, then we wouldn't be here today." (Emphasis omitted.) We found this statement to be improper because it impermissibly shifted the burden of proof to the defendant. *Id.,* ¶ 17, 100 P.3d at 390–391. The State argues that its statement here is distinguishable from that in *Condra* because the context shows the prosecutor was referring to defending oneself from one's spouse, and not against the pending criminal charges. The prosecutor's argument was as follows:

> And I just ask you to consider the evidence that you have heard. Consider what the motives of the defendant are. If these motives are pure and you are conducting legitimate health-related things with your children, you don't do them in privacy. You don't do them late at night. You don't do them behind your spouse's back. If you're acting appropriately with your child, then you don't have to defend yourself.

[¶ 42] Mr. Sanderson's interpretation—that the prosecutor meant "you don't have to defend yourself [against criminal charges]"— is plausible based on the transcript. So is the State's interpretation that the statement should read as, "If you're acting appropriately with your child, then you don't have to defend yourself [against your wife]." By using the phrase "here today," the prosecutor in *Condra* left no room for interpretation that his remarks applied to anything other

than the ongoing criminal proceedings. *Id.*, ¶ 9, 100 P.3d at 389. Here, however, we are presented with two plausible interpretations, one of which supports a finding of no prosecutorial misconduct. Accordingly, we are unable to find plain error.

### Sufficiency of "Physical Injury" Evidence

[¶ 43] Finally, Mr. Sanderson asserts that there was insufficient evidence of "physical injury" to support the two child abuse convictions. He claims that any injury was too minor or transitory to qualify as "physical injury" as defined by the statute. As with any challenge to the sufficiency of the evidence, "we view the evidence, and any applicable inferences based on the evidence, in a light most favorable to the State." *Rawle v. State*, 2007 WY 59, ¶ 21, 155 P.3d 1024, 1030 (Wyo.2007). Rather than substitute our judgment for that of the jury, we instead "determine whether a quorum of reasonable and rational individuals would, or even could, have found the essential elements of [the crime] were proven beyond a reasonable doubt." *Id.*

[¶ 44] The statute defines "physical injury" as "any harm to a child including but not limited to disfigurement, impairment of any bodily organ, skin bruising if greater in magnitude than minor bruising associated with reasonable corporal punishment, bleeding, burns, fracture of any bone, subdural hematoma or substantial malnutrition." Wyo. Stat. Ann. § 14–3–202(a)(ii)(B). We have seldom been required to consider the scope of the physical injury definition under the child abuse statute. Indeed, when previously confronted with whether abuse has occurred under the statute, the magnitude of the injury has never been a serious question. *E.g.*, *Beaugureau v. State*, 2002 WY 160, ¶ 8, 56 P.3d 626, 630 (Wyo.2002) (bloodied and broken nose and being forced to put hand in acetylene torch sufficient for child abuse conviction); *RM v. Department of Family Servs.*, 953 P.2d 477, 479, 481 (Wyo.1998) (head bruises from slamming head on floor while doing pushups as discipline, rough and red looking hands from doing dishes for long

periods, and gash from being hit with spatula were substantial evidence to support Department's abuse substantiation).

[¶ 45] Because the statute's structure is that of a list and a catch-all description ("any harm"), we apply the principle of *ejusdem generis*, or of the "same general kind or class." *RME Petroleum Co. v. Wyoming Dept. of Revenue*, 2007 WY 16, ¶ 46, 150 P.3d 673, 690 (Wyo.2007); *Black's Law Dictionary* 556 (8th ed.2004). This rule requires that "general words, [associated with] an enumeration of words with specific meanings, should be construed to apply to the same general kind or class as those specifically listed." *RME*, ¶ 46, 150 P.3d at 689–90 (quoting *Powder River Coal Co. v. Wyoming State Bd. of Equalization*, 2002 WY 5, ¶ 19, 38 P.3d 423, 429–30 (Wyo.2002)); *Liberty v. State, Dept. of Transp.*, 342 Or. 11, 148 P.3d 909, 913 (2006). The State's broad reading of the phrase "any harm" to encompass any harm, no matter how small, fails under this rule. Still, the question remains whether the State introduced sufficient evidence of harm as contemplated by the statute.

[¶ 46] Taken in the light most favorable to the State, the evidence established that Mr. Sanderson first approached AS with a starting-fluid-saturated cloth and put it up to her face. He told her to breathe very hard. He also prevented her from looking away when she tried to breathe fresh air. This resulted in AS feeling sick. She reported impaired vision or perception, dizziness, nausea, and head pain. At this point, she made her way to her bed and passed out.[3] The evidence further reflected that after his experience with AS, Mr. Sanderson adjusted his technique and concentrated the starting fluid by placing the saturated cloth in a plastic bag. He put the bag up to TS's face and told her to "sniff it really, really hard." Like her sister, TS tried to turn away from the noxious smell, but Mr. Sanderson kept the bag to her face. TS's symptoms were even more severe than AS's. TS threw up, seemed to have disordered thought, was light-headed and dizzy, and also passed out.

---

3. While witnesses generally used the phrase "fell asleep" rather than "passed out," AS herself described her experience as passing out in one of her recorded interviews. "Passed out" is more appropriate given our mandate to draw all reasonable inferences in favor of the jury's verdict.

Because of her physical reaction to the fumes, TS was unable to go to school that day.

[¶ 47] Additionally, the State's medical expert described the potential harm of each component of the starting fluid. He testified that the chemicals could cause a variety of problems, including central nervous system depression leading to respiratory depression. He testified that they could cause a person to stop breathing, and lead to death in a variety of ways. According to the doctor, the symptoms the victims reported were consistent with central nervous system depression. Finally, he testified that central nervous system depression changed the function of the brain, a bodily organ: "It prevents the brain from cognition and prevents the brain from thinking clearly, puts the brain to sleep. High enough dose, prevents the sensation of pain." The doctor was very clear that all effects from inhaling the starting fluid would depend on the dose. But the jury was certainly able to come to the conclusion that Mr. Sanderson exposed both daughters to enough starting fluid to cause "impairment of [a] bodily organ." Wyo. Stat. Ann. § 14–3–202(a)(ii)(B).

[¶ 48] Finally, Mr. Sanderson argues that—in his view—any harm AS and TS suffered from inhaling starting fluid was temporary and minor. But the nature of the harms articulated in the statute illustrates that the legislature did not intend only permanent injury to be unlawful. While the phrase "disfigurement" implies permanent or long-lasting effect, the terms "bruising ... bleeding, burns, [or] fracture of any bone" show that the statute also includes injuries that may heal over time. Wyo. Stat. Ann. § 14–3–202(a)(ii)(B). Several of the injuries listed, notably bleeding or bruising, may later be completely undetectable. The State presented the jury with sufficient evidence to establish "physical injury."

[¶ 49] Affirmed.