WELCH, Judge.
W.R.C. was convicted of sodomy in the first degree, a violation of § 13A-6-63(a)(3), Ala.Code 1975, and of sexual abuse in the first degree, a violation of former § 13A-6-66(a)(3), Ala.Code 1975.[1] He was sentenced to 20 years’ imprisonment for the sodomy conviction and to 10 years’ imprisonment for the sexual-abuse conviction, the sentences to run concurrently.
The evidence adduced at trial indicated the following. L.O. lived with his grandmother, E.O., from the time he was born until he was 13 years old. L.O., who was 17 years old at the time of trial in 2009, testified that when he was approximately 7 years old, E.O.’s then husband, W.R.C.,[2] sexually assaulted him over the span of a month. L.O. said the first incident occurred when he was in the bathtub; *935 W.R.C. got in the bathtub with him and washed his back. After the bath, L.O. said, W.R.C. told him to go to E.O.’s room[3] and wait while he brought L.O. some clothes. L.O. testified that he was clad in a towel and that, after W.R.C. brought him clothes, he tried to get dressed, but W.R.C. would not let him and laid him on his back on the bed. L.O. said that W.R.C., who was nude, began rubbing up against him and kissing the upper part of his body. When L.O. questioned W.R.C. and told him to stop, W.R.C. told him it was okay and to be quiet. L.O. testified that W.R.C. then turned him over onto his stomach and inserted his penis into L.O.’s anus. During the assault, L.O. said, he cried loudly because of the pain he was experiencing, and W.R.C. put his hand over L.O.’s mouth. L.O. said that the assault ended when his next-door neighbor, C.W., knocked on the front door and questioned W.R.C. about L.O.’s screaming. According to L.O., W.R.C. told C.W. either that L.O. was just playing around or that L.O. had just received a “whipping.” (R. 66.)[4] After the incident, L.O. said, W.R.C. told him to “keep this between us” and threatened that if L.O. told anyone, he would kill both L.O. and E.O. (R. 74.)
L.O. testified that the second incident occurred a couple of nights later while he and W.R.C. were in the living room and E.O. was upstairs in her bedroom. L.O. said that, this time, W.R.C. rubbed his genitals, first doing so over L.O.’s clothes and then putting his hand inside L.O.’s pants. L.O. said that W.R.C. then unbuttoned his pants, “pulled his penis out,” and forced L.O. to “caress him.” (R. 72.) According to L.O., W.R.C. then asked him to “taste it.” (R. 72.) L.O. stated that he initially refused but that W.R.C. again threatened E.O.’s life, so he complied and performed oral sex on W.R.C. L.O. testified that W.R.C. forced him to perform oral sex on W.R.C. several times after this incident.
L.O. testified that the last time W.R.C. sexually assaulted him was on E.O.’s birthday. According to L.O., he was asleep on the couch that evening, after E.O. had gone out with friends to celebrate her birthday, when he awoke to a sharp pain in his anus and discovered that W.R.C. had again inserted his penis into L.O.’s anus. L.O. said that he begged W.R.C. to stop and that W.R.C. then stopped and promised L.O. that it would never happen again, and, in fact, it did not happen again according to L.O.
L.O. testified that he did not tell anyone about the assaults at the time they occurred because he did not want to talk about it; because he knew no one else who was suffering from something similar; because even though E.O. and W.R.C. separated shortly after the incidents, they still communicated; and because he did not want to hurt his grandmother. L.O. denied repressing any memories of the assault, stating that he always remembered but that he just did not tell anyone. However, L.O. said that he moved in with his aunt when he was approximately 18 years old, that they became close after he had lived with her for a couple of years, and that, when he was 15 or 16 years old, he confided in her about the assaults.
*936 W.R.C. called several character witnesses to testify in his defense and also testified on his own behalf. He denied the allegations against him.
I.
W.R.C. first contends on appeal that the trial court erred in allowing what he claims was expert testimony regarding Child Sexual Abuse Accommodation Syndrome (“CSAAS”) and delayed disclosure by child sexual-abuse victims from Maribeth Thomas, the clinical director of the Prescott House Child Advocacy Center, because, he says, such testimony is inadmissible under Rule 702, Ala. R. Evid., and Rule 403, Ala. R. Evid. Specifically, W.R.C. argues that there is no consensus in the scientific community as to the “typical” reaction a child has to sexual abuse and, thus, that evidence indicating that someone exhibits behaviors associated with CSAAS does not indicate that someone has actually been abused; instead, W.R.C. argues, a diagnosis of CSAAS assumes that abuse has occurred. Therefore, W.R.C. concludes, testimony regarding CSAAS is unreliable and can never “assist the trier of fact” under Rule 702, and, W.R.C. asserts, its prejudicial effect outweighs any probative value under Rule 403. W.R.C. recognizes this Court’s opinions in Sexton v. State, 529 So.2d 1041 (Ala.Crim.App.1988), and Sciscoe v. State, 606 So.2d 202 (Ala.Crim.App.1992), in which this Court held that expert testimony in child-abuse cases is generally admissible if it assists the trier of fact in understanding the evidence presented. However, he argues that those cases were decided before Rule 702 was adopted and, thus, are not applicable to a Rule 702 analysis, which, he claims, requires a determination by the trial court of the reliability of the proffered testimony before its admission.
The record reflects that just before the State called Thomas, its last witness, W.R.C. moved in limine to prohibit her testimony.[5] W.R.C. made the same arguments to the trial court as he does on appeal.[6] When specifically arguing that Thomas should not be allowed to testify that certain conduct exhibited by L.O. is consistent with children who have been sexually abused, the prosecutor pointed out that Thomas had never interviewed or even met L.O. and that she was not going to testify about L.O. at all. The prosecutor then indicated that Thomas’s testimony would be limited to
“children and adolescents who have been abused and delay in disclosing that abuse based upon her personal experience [working with abused children] as well as her familiarity with a large bank of information used around the country as to why children normally do not disclose or why they disclose, as well as the difference between male victims and female victims in disclosing, disclosure when the perpetrator is a family member versus a stranger, and reasons for delays and disclosure....
[[Image here]]
“[and] the bond that children typically have to build in order to have a trust relationship with somebody to disclose, that it’s normal for children not to know specific days of abuse unless there’s something significant attached to that....”
*937 (R. 246-47.) In response, W.R.C. argued, as he does on appeal, that there is no consensus in the scientific community as to the typical reaction a child has to sexual abuse and, thus, that any testimony regarding typical reactions to sexual abuse would be inadmissible under Rule 702. The trial court denied the motion in limine, finding the expected testimony of Thomas to be admissible under Rule 702, and it informed W.R.C.’s counsel that further objections to Thomas’s testimony would not be necessary.
Thomas was then certified by the court, over W.R.C.’s objection,[7] as an expert in child development and child and adolescent sexual abuse, and she testified that, in her experience and based on research done in the subject area, child victims of sexual or physical abuse do not always disclose the abuse and that nondisclosure may be because the perpetrator is an adult or a family member, because the child does not have the vocabulary to describe the abuse, because the child fears the consequences of disclosure, or because the perpetrator has threatened the child. Thomas testified “that both experientially and the research indicates that male victims are less likely to disclose than female victims” (R. 265), and that there is a “significant difference” between males and females with respect to delayed disclosure. (R. 270.) She testified that when the perpetrator is a family member, both her experience and research in the area indicate that child victims are more likely not to disclose or to delay disclosure. With respect to delayed disclosure, Thomas said that statistics indicate child sexual-abuse victims “more often than not” delay disclosing the abuse. (R. 281.) She also testified that such delayed disclosure may be the result of a lack of understanding of how to make the disclosure, which is why sometimes children will disclose in the fifth or sixth grade, when the state begins sex education for students. She also said that delayed disclosure could be the result of fear by the child victim of the consequences of disclosing the abuse. According to Thomas, when disclosure is made, it is typically made to someone the child victim trusts. Thomas also testified that it is not unusual for a child victim not to be able to provide a specific date that the abuse occurred unless the abuse occurred on a typically memorable day, such as Christmas or a birthday. Defense counsel thoroughly cross-examined Thomas, eliciting from her that every child is different and that not all children react the same way to abuse— some child victims show no signs of dysfunction at all, while others show dramatic signs of dysfunction. Defense counsel also elicited testimony from other witnesses, including L.O., that L.O. exhibited no signs of dysfunction, had good grades in school, and was active in extracurricular activities at school.
Initially, we note that the State argues that W.R.C.’s appellate arguments regarding the admissibility of testimony regarding CSAAS are not properly before this Court for review and are meritless because, it says, no testimony regarding CSAAS was introduced at trial. We agree with the State, to an extent, that W.R.C.’s characterization of Thomas’s testimony as CSAAS testimony is questionable. CSAAS is essentially a “profile” of child sexual-abuse victims that contains a list of characteristics and behaviors that are allegedly “typical” of such victims, such as (1) secrecy; (2) helplessness; (3) entrapment and accommodation; (4) delayed, conflicted, and unconvincing disclosure; *938 and (5) retraction. See, e.g., Elizabeth Trainor, Annotation, Admissibility of Expert Testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS) in Criminal Case, 85 A.L.R.5th 595 (2001), and the cases cited therein. Thomas, however, did not testify regarding any syndrome or about any “typical” characteristics of abused children; her testimony was limited to delayed disclosure by some child victims and the possible reasons for such delayed disclosure. All of her testimony was based on her own experience in working with abused children and on research that had been done in the field of abused children. In addition, as noted above, Thomas specifically testified on cross-examination that all children are different and that every child victim reacts differently to abuse. Thus, we seriously question whether Thomas’s testimony can be considered testimony regarding CSAAS.
That being said, delayed disclosure is considered one element of CSAAS, and, as such, Thomas’s testimony in this regard is not necessarily outside the realm of CSAAS testimony. For the purposes of this opinion, then, we presume that Thomas’s testimony falls within the category of CSAAS testimony, and we address it as such.
Rule 702, Ala. R. Evid., provides:
“If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.”
In addition, Rule 403, Ala. R. Evid., provides:
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
Relying on Simmons v. State, 797 So.2d 1134 (Ala.Crim.App.1999), W.R.C. argues that “the threshold determination for the admissibility of non-scientific evidence under Rule 702 is reliability, not whether the testimony will assist the trier of fact” (W.R.C.’s brief at p. 28), and that because there is no consensus in the scientific community as to the “typical” characteristics or behaviors of sexually abused children, testimony about CSAAS cannot satisfy the reliability requirement for admission under Rule 702. In Simmons, this Court engaged in a lengthy analysis of Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), in determining whether nonscientific expert testimony regarding crime-scene analysis and victimol-ogy was admissible under Rule 702. In doing so, this Court implicitly suggested that the Daubert standard for admissibility of scientific evidence — including reliability of proffered testimony — is applicable to nonscientific expert testimony, such as Thomas’s testimony in this case. However, as this Court later clarified in Barber v. State, 952 So.2d 393 (Ala.Crim.App.2005), although Simmons referred to Daubert and Kumho, “we did not specifically hold [in Simmons ] that Daubert governs the admissibility of nonscientific expert testimony,” and “we do not [now] read Simmons to require that the admissibility of nonscientific expert testimony be governed by Daubert.” 952 So.2d at 415. Further, this Court specifically noted in Barber that Rule 702 alone, and not Daubert, Kumho, or Frye v. United, States, 293 F. 1013 (D.C.Cir.1923), governed the admissibility of nonscientific expert testimony, and we held that nonscientific expert testimony *939 regarding fingerprint examination “satisfied the requirements of Rule 702” when (1) the witness was qualified as an expert in the field and (2) the testimony assisted the jury in determining a fact in issue, i.e., the defendant’s guilt. 952 So.2d at 417. Rule 702 contains no requirement that the expected testimony be reliable under Daubert; it requires only that the testimony “will assist the trier of fact to understand the evidence or to determine a fact in issue,” and this Court in Barber expressly rejected any interpretation of Simmons that would require a reliability determination under Daubert before admission of nonscientific expert testimony under Rule 702. Therefore, W.R.C.’s reliance on Simmons is misplaced, and his argument that reliability is a threshold requirement for admission of testimony about CSAAS under Rule 702 is meritless.
Thomas’s testimony clearly satisfies the requirements of Rule 702 and Rule 403.[8] Thomas was certified by the trial court as an expert in the areas of child development and child and adolescent sexual abuse, and her testimony regarding delayed disclosure, based on her specialized knowledge in those fields, clearly assisted the jury to understand the evidence presented regarding L.O.’s waiting almost 10 years to report his abuse. Moreover, Thomas’s testimony was general in nature, and no testimony was presented about L.O. specifically. At no time did Thomas testify that L.O.’s behavior was consistent with children who had been sexually abused or that she believed L.O.’s accusations. Nor did Thomas opine that L.O. had been sexually abused. Finally, L.O.’s credibility was the central issue in the case, because he was the sole witness presented by the State in support of the charges against W.R.C., and defense eoun-sel challenged L.O.’s credibility on cross-examination. Under these circumstances, we cannot say that the prejudicial effect of Thomas’s testimony outweighed its probative value.
We note that other jurisdictions have held similar testimony to be admissible in child-sexual-abuse cases. See, e.g., People v. Perez, 182 Cal.App.4th 231, 105 Cal. Rptr.3d 749 (Cal.Ct.App.2010) (general rule in California is that, although CSAAS testimony is not admissible to prove the crime charge actually occurred, it is admissible to rehabilitate the credibility of the victim when the defendant suggests that the victim’s conduct, such as a delay in disclosing the abuse, is not consistent with the claim of abuse); People v. Bassett, 55 A.D.3d 1434, 866 N.Y.S.2d 473 (2008) (testimony regarding CSAAS is admissible to assist the trier of fact in understanding unusual conduct of victims as long as the testimony is general in nature and does not attempt to prove the charged crimes); State v. Schnabel, 196 N.J. 116, 952 A.2d 452 (2008) (general rule in New Jersey is that CSAAS testimony is admissible to explain traits sometimes found in abused children that could undermine the victim’s credibility and to dispel preconceived conceptions regarding victims of abuse); Sanderson v. State, 165 P.3d 83 (Wy.2007) (general rule in Wyoming is that CSAAS testimony is admissible to dispel misconceptions regarding victims of abuse if a victim’s post-abuse behavior is an issue in the case, such as when a victim recants allegations of sexual abuse; then testimony regarding that particular aspect of CSAAS is admissible); Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir.2003) (noting that “CSAAS testimony is admissible in federal child-sexual-abuse trials, when the *940 testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth”). But see Sanderson v. Commonwealth, 291 S.W.3d 610 (Ky.2009) (general rule in Kentucky is that CSAAS testimony is not admissible under any circumstances).
Therefore, we find no abuse of discretion on the part of the trial court in allowing Thomas’s testimony.
II.
W.R.C. also contends on appeal that the trial court erred in not providing him with funds to hire an expert on CSAAS to rebut the State’s expert. He argues that failure to provide him with funds denied him his right to a fair trial. We agree with the State that this issue was not properly preserved for review.
The record reflects that, before trial, W.R.C. simultaneously filed three motions for funds for experts: (1) a “Motion for Funds for Psychiatrist”; (2) a “Motion for Private Psychiatric Examination and Testing”; and (3) a “Motion for Appointment of Certain Experts.” (C. 77-89.) W.R.C. attached to the second motion a memorandum entitled “Memorandum of Points and Authorities in Support of Motion for Funds for Experts and Investigators.” (C. 79.)[9] In the first two motions, W.R.C. requested that the trial court “grant him the right” to have the victim, L.O., examined so that L.O.’s “sanity and/or mental illness at the time of the alleged offense and at the present time” could be determined and requested funds to hire a psychiatrist “whose specialty is criminal psychopathic behavior” to conduct such an examination of L.O. In his memorandum attached to the second motion, W.R.C. made a lengthy argument regarding an indigent defendant’s right to investigative and expert assistance, citing numerous cases and arguing that the failure to provide such assistance violates various provisions of the United States Constitution. W.R.C., however, did not further specify in that memorandum any other specific expert he wanted to hire, other than a brief reference to “an investigator with sociological training” to discover information regarding W.R.C.’s background and history. (C. 85.) In his third motion, W.R.C. requested that the trial court appoint a “[psychiatrist” and “[ajpprove funds to hire a [p]sychiatrist.”
At a pretrial hearing on the motions, W.R.C.’s counsel stated that all three motions were “somewhat similar,” and when asked by the court ‘You’re not trying to test the defendant. You’re trying to test the victim, right[,]” counsel responded in the affirmative (R.Supp. 18) and then made a lengthy argument about why he believed L.O. had psychological issues and why he should be allowed to have L.O. evaluated by an expert. At no point during the hearing did W.R.C.’s counsel request funds to hire an expert on CSAAS to rebut the State’s expert. Indeed, when the trial court specifically mentioned the “Motion for Appointment of Certain Experts,” W.R.C.’s counsel stated that that motion “was tied into what we previously discussed” regarding having L.O. examined. (R.Supp. 23.)
The trial court denied the motions, with the following notations on the case-action-summary sheet:
“Defendant’s Motion for private psychiatric examination and testing — Denied. The Court is not aware of any case law allowing the defense to require that an *941 alleged victim be subjected to psychiatric testing. In fact, Barger v. State, 562 So.2d 650 (Ala.Crim.App.1989) clearly indicates that there is no ‘statute or other authority which would authorize a trial court to order the psychological examination of a child victim of sexual abuse.’ Following the hearing held on July 18, 2008 addressing all pending motions, the Court reviewed documents received from the Alabama Department of Human Resources which are presently under seal. In this Court’s opinion, nothing in those documents supports the Defendant’s assertion that the alleged victim should be ordered to be examined by a psychiatrist or professional mental health expert.
“Defendant’s Motion for Funds for Psychiatrist — Moot based upon the Court’s denial of Defendant’s motion for private psychiatric examination.
“Defendant’s Motion for appointment of certain experts — See Ruling on last two motions.”
(C. 16-17.)
In his motion for a new trial, W.R.C. noted that the State had presented two experts[10] and argued that the trial court had erred in denying his “Motion for Appointment of Certain Experts” so that he could “rebuke” the testimony of the State’s experts. (C. 128.) At the hearing on the motion for a new trial, W.R.C.’s counsel then made the following statement':
“Judge, there was two expert witnesses called by the State. One was Maribeth Thomas, who was a counselor. And the other one was the doctor. And the doctor’s name is Dr. David Bernard.
“The defendant did not have an expert witness. We had filed a motion to appoint expert witnesses. We had filed a motion for funds for an expert witness, and Your Honor denied those requests.”
(R. 458.) However, W.R.C.’s counsel then moved on to other arguments, devoting the majority of his argument at the hearing to the trial court’s denial of his request for funds to hire a psychiatrist to evaluate L.O., the trial court’s denial of his motion in limine to prohibit Thomas’s testimony, and the trial court’s refusal to allow him to view the videotape of an interview with L.O. at the Prescott House. The trial court noted during the hearing that it had denied W.R.C.’s request for funds because he was not entitled to have the victim evaluated and the State likewise pointed out that the trial court had already ruled on W.R.C.’s request for an appointment of a psychiatrist to evaluate the victim and argued that it was not a proper subject for a motion for a new trial.
W.R.C. argues in his reply brief that his “Motion for Appointment of Certain Experts” properly preserved his argument that he was entitled to funds to hire an expert on CSAAS to rebut the State’s expert, and he points out that his counsel’s statements at the hearing on the motion for a new trial indicate that “counsel believed that the issue” of funds to hire an expert to rebut the State’s expert had been raised in his pretrial motions. (W.R.C.’s reply brief at p. 12.) However, the record clearly shows that W.R.C.’s counsel was the only one who thought that W.R.C. had requested funds to hire an expert to rebut the State’s expert. Both the State and the trial court believed that W.R.C.’s only request for funds was for a psychiatrist to examine the victim. As the Alabama Supreme Court explained in Ex parte Parks, 923 So.2d 380 (Ala.2005):
“The critical consideration for the preservation of error for appellate review is *942 that the trial court be sufficiently informed of the basis of the defendant’s argument. We have stated:
“ ‘ “Specific objections or motions are generally necessary before the ruling of the trial judge is subject to review, unless the ground is so obvious that the trial court’s failure to act constitutes prejudicial error .... An objection without specifying a single ground, such as ‘I object,’ ‘objection,’ or ‘we object’ is not sufficient to place the trial court in error for overruling the objection.” ’ ”
923 So.2d at 333 (emphasis added) (quoting Ex parte Works, 640 So.2d 1056, 1058 (Ala. 1994)).
Here, the trial court was clearly not aware that W.R.C. wanted funds to hire an expert on CSAAS to rebut the State’s expert, and W.R.C.’s general “Motion for Appointment of Certain Experts,” requesting only a “psychiatrist,” with no explanation as to the reason for the request, was not sufficient to put the trial court on notice that he wanted an expert on CSAAS to rebut the State’s expert, especially considering that that motion was filed simultaneously with his other motions and W.R.C.’s counsel specifically argued at the pretrial hearing on those motions that all three encompassed the same request: a psychiatrist to evaluate L.O. Therefore, W.R.C.’s pretrial motions did not preserve this issue for review.
Moreover, W.R.C.’s raising of the issue of funds to hire an expert to rebut the State’s expert in his motion for a new trial was untimely and was not sufficient to preserve this issue for review. It is well settled that “[gjrounds urged in a motion for a new trial must ordinarily have been preserved at trial by timely and sufficient objections.” Williams v. State, 710 So.2d 1276, 1311 (Ala.Crim.App.1996). Because W.R.C. did not timely request funds to hire an expert on CSAAS to rebut the State’s expert, this issue was not properly preserved for review and will not be considered.
Based on the foregoing, the judgment of the trial court is affirmed.
AFFIRMED.
WISE, P.J., and WINDOM, KELLUM, and MAIN, JJ., concur.

. Section 13A-6-66, Ala.Code 1975, was amended effective July 1, 2006, after the date of the act forming the basis of W.R.C.’s conviction, to remove subsection (a)(3) (the sexual abuse of a child less than 12 years old); that subsection was placed in § 13A-6-69.1, Ala.Code 1975, and the offense was increased from a Class C felony to a Class B felony.

. E.O. and W.R.C. separated shortly after the incidents giving rise to the charges against W.R.C., and they divorced in 2004.

. E.O. was not at home at the time.

. C.W. testified at trial that she recalled the day she heard L.O. "hollering,” and she confirmed L.O.’s testimony that W.R.C. told her that L.O. was just "playing.” (R. 158-59.) She also stated that she mentioned it to E.O. the following day, but C.W. said that she did not think anything was wrong. E.O. also testified at trial and confirmed that C.W. had mentioned to her about hearing L.O. hollering. E.O. stated that this occurred during the time she was married to, and living with, W.R.C.

. W.R.C. filed a written motion in limine in court and also argued orally that Thomas’s testimony should be prohibited.

. He also made additional arguments to the trial court that he does not pursue on appeal. We do not address those arguments. See, e.g., Brownlee v. State, 666 So.2d 91, 93 (Ala.Crim. App.1995) ("We will not review issues not listed and argued in brief.”).

. W.R.C. does not assert on appeal that Thomas was not properly certified as an expert.

. Because we conclude that Thomas's testimony was admissible under Rule 702, we need not address W.R.C.’s argument that this Court’s holdings in Sexton and Sciscoe, supra, did not survive the adoption of Rule 702.

. We note that, in the record on appeal, the memorandum appears just behind the third motion — the "Motion for Appointment of Certain Experts.” However, at the pretrial hearing on the motions, the trial court stated that the memorandum was actually attached to the second motion — the "Motion for Private Psychiatric Examination and Testing.”

. In addition to Thomas, the State also presented testimony from David Bernard, a pediatrician and the director of the Children's Hospital Intervention and Prevention Services (“CHIPS”) Clinic at Children's Hospital in Birmingham, regarding child sexual abuse.