2008 WY 22

**Brandy Diana LARGE, Appellant (Defendant),**

v.

**The STATE of Wyoming, Appellee (Plaintiff).**

No. 06–89.

Supreme Court of Wyoming.

Feb. 28, 2008.

Representing Appellant: D. Terry Rogers, Interim Public Defender; Donna D. Domonkos, Appellate Counsel; Ryan R. Roden, Senior Assistant Public Defender; David E. Westling, Senior Assistant Public Defender. Argument by Mr. Westling.

Representing Appellee: Patrick J. Crank, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; James Michael Causey, Assistant Attorney General. Argument by Mr. Causey.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

BURKE, Justice.

[¶ 1] Brandy Large appeals her convictions on one count of Conspiracy to Commit Sexual Assault in the Second Degree, in violation of Wyo. Stat. Ann. §§ 6–2–303(a)(v) and 6–1–303(a), and two counts of Sexual Exploitation of Children, in violation of Wyo. Stat. Ann. § 6–4–303(b)(ii).[1] She contends that the trial court allowed impermissible testimony that vouched for the victim's credibility as well as testimony that constituted improper expert opinion of her guilt. She also challenges testimony that she asserts was inadmissible hearsay. We affirm her convictions.

## ISSUES

[¶ 2] Ms. Large phrases the issues as follows:

1. Did plain error occur when the trial court permitted expert witness testimony that vouched for and bolstered the victim's testimony and out-of-court statements?

2. Did *per se* error occur when the prosecutor elicited expert witness testimony that Appellant was guilty of participating in the sexual assault of the victim?

3. Did plain error occur when the trial court allowed witnesses to repeat the alleged victim's and her brother's out-of-court statements?

The State presents the issues as follows:

1. Did the district court erroneously allow the testimonies of two expert witnesses-Psychologist Dr. Mark Gibson and therapist Kathy England-regarding their interactions with and opinions regarding Appellant's young victim, JL?

2. Did the prosecutor elicit expert testimony from Dr. Mark Gibson that he believed Appellant had participated in the sexual abuse of the victim, JL?

3. Did the district court commit plain error by allowing the introduction of testimonies from a foster parent and a prosecution investigator concerning their interactions and conversations with JL and her brother, ML?

---

1. Wyo. Stat. Ann. § 6–2–303(a) (LexisNexis 2005):

 Any actor who inflicts sexual intrusion on a victim commits sexual assault in the second degree if, under circumstances not constituting sexual assault in the first degree:

 . . .

 (v) At the time of the commission of the act the victim is less than twelve (12) years of age and the actor is at least four (4) years older than the victim.

 Wyo. Stat. Ann. § 6–1–303(a) (LexisNexis 2005): "A person is guilty of conspiracy to commit a crime if he agrees with one (1) or more persons that they or one (1) or more of them will commit a crime and one (1) or more of them does an overt act to effect the objective of the agreement."

 Wyo. Stat. Ann. § 6–4–303(b) (LexisNexis 2005): "A person is guilty of sexual exploitation of a child if, for any purpose, he knowingly: ... (ii) Causes, induces, entices or coerces a child to engage in, or be used for, any explicit sexual conduct."

## FACTS

[¶ 3] JL is the daughter of Ms. Large. She was eight years old at the time of the alleged crimes. Mr. Dye was Ms. Large's boyfriend. He admitted sexually abusing JL on two occasions, and agreed to plead guilty to charges arising from those incidents. The issue at trial was whether Ms. Large also participated. At trial, Mr. Dye testified that it was Ms. Large who suggested involving JL in their sexual activity. On two occasions, according to Mr. Dye, they acted on her suggestion and Ms. Large actively participated.

[¶ 4] JL testified at trial that Mr. Dye and Ms. Large forced her to perform several sexual acts. She described the sexual acts and testified that all three participants were unclothed at the time of the incidents. JL reported that Ms. Large showed her how to perform the acts and then made her do them. JL's younger brother, ML, also testified briefly. He testified that he had seen JL, Mr. Dye, and Ms. Large in their home's living room, that Mr. Dye "was showing [JL] how to do sex," and that Ms. Large was with them. ML testified that they were unclothed at the time. He also testified that Ms. Large instructed him not to tell anyone what he had seen.

[¶ 5] During the trial, the State also presented the testimony of JL's two foster mothers, Ms. Shelley Hamel and Ms. Teri Harmon. Ms. Hamel testified that during the six to seven weeks that JL lived with her, she observed several behaviors in JL that she considered inappropriately sexual for a child of JL's age. After one particular incident involving JL and another foster child, Ms. Hamel grew concerned that JL posed a threat to the safety of other children in the household. She called the Department of Family Services (DFS) and asked that JL be moved to a different foster home. DFS acceded to the request and placed JL with Ms. Harmon.

[¶ 6] Ms. Harmon also testified that JL engaged in inappropriate sexual behavior while in her care. She testified that the school sent home notes to her describing similar behavior while JL was in school. When Ms. Harmon asked JL about the behavior, JL revealed information indicating that she had been sexually abused by Mr. Dye. Later, JL disclosed to Ms. Harmon that Ms. Large had participated in the sexual activity.

[¶ 7] JL's two counselors also testified at trial. Dr. Mark Gibson is a counseling psychologist who provided treatment to JL while she was in foster care. Dr. Gibson had also briefly treated JL several years previously. Dr. Gibson testified that over the course of treating JL while she was in foster care, he observed behaviors that JL had not exhibited during her earlier treatment. These new behaviors led him to conclude that JL had been sexually abused in the interim. Dr. Gibson testified that, in the course of treatment, JL described her sexual activity with Mr. Dye and Ms. Large. He reported to DFS that JL may have been sexually abused by Mr. Dye and Ms. Large.

[¶ 8] Ms. Kathy England, a licensed counselor, began treating JL in late summer of 2005. She testified that she provided counseling to JL at DFS's request and that, during treatment, JL described her sexual activity with Mr. Dye and Ms. Large. The State also called its investigator, Randy Bingham, who testified about his interview with JL's brother, ML, and repeated statements made by ML during that interview.

[¶ 9] Ms. Large did not dispute that Mr. Dye sexually abused JL. Instead, her defense theory was that JL and ML had been influenced by the questioning of various adults to make false accusations against her. As part of this defense strategy, Ms. Large mounted a pre-trial challenge to JL's testimony. She asserted that JL was not competent to testify, and that JL had been subject to undue influence from the adults involved in the investigation and in JL's mental health treatment. The district court held a pre-trial hearing to address Ms. Large's claims and ruled that JL would be permitted to testify at trial. During trial, Ms. Large pursued this line of defense throughout opening statements, cross-examination of witnesses, and closing argument. She did not testify and rested at the conclusion of the State's case against her.

[¶ 10] The jury found Ms. Large guilty on all three counts. The district court sentenced Ms. Large to six to fifteen years imprisonment for Conspiracy to Commit Sexual Assault in the Second Degree, and six to twelve years for each of the two counts of Sexual Exploitation of Children, all three sentences to run consecutively. Ms. Large filed this timely appeal.

## DISCUSSION

### Dr. Gibson's Testimony

[¶ 11] Ms. Large contends that Dr. Gibson impermissibly provided opinion testimony of her guilt and vouched for the credibility of JL. She asserts that the alleged opinion testimony was elicited directly by the State and that the testimony was error per se mandating reversal of her convictions. She contends that receipt of the alleged "vouching" testimony was plain error. The State denies that Dr. Gibson offered any opinion regarding Ms. Large's guilt and also asserts that Dr. Gibson did not improperly vouch for JL's credibility. Regardless of whether the issue presented is viewed as "opinion of guilt" or "vouching," the State contends that we must apply a plain error analysis.

[¶ 12] Ms. Large focuses her challenge on two excerpts from the testimony of Dr. Gibson. The first portion of testimony reads:

Q. [By the prosecutor]: And do you go into detail about what happened to her that caused this change [in behavior from the first time you treated JL]? Because it does seem, and I'm not an expert, it seems like there's a big change between 2001 and 2004 in this little girl. Am I right or wrong?

A. There was a change. Something I failed to mention, there was also—at least according to my memory from the first report, there wasn't [the same conduct that the foster mothers observed].... [W]hen I see [those behaviors], it leads me along a path to believe that, wow, something's happened here. It's not a foolproof symptomology, but it's definitely something's happened to this little girl that's very concerning.

Q. And what was that? What did you think was happening or had happened to her?

A. My belief was that she had been abused in some way, and later, it was reported by the client herself, [JL], that that was true.

Q. What did she tell you in that regard?

A. As you said, it—it did come out bit by bit. She was too nervous to talk about much at all, and I believe she even told her second set of—well, her foster parents some of the things that happened to her before she would talk to me about it, and some—how much ... detail [do] you want me to go [in] on these things?

Q. Well, was there an incident that occurred with her foster parents that kind of triggered-triggered this feeling on your part that there was a problem with the sexual assault?

A. When she was with the [first foster] family, they were having a great deal of trouble with her behaviors, but they— they also did a good job with what they were asked to do, and they would-and part of that was they would have long talks with her, and they would have times when they would just hold her, and they would talk to her one-on-one or two-on-two, and during some of those discussions, she would reveal things to them that had happened to her in the past, and she would do this in—in tears, and the foster parents believed she was very sincere with what happened.

[Defense Counsel]: Objection. It's hearsay.

The Court: Sustained.

[Defense Counsel]: And inappropriate.

The Court: The objection is sustained.

Q. [By the prosecutor]: Did you get this information as far as who might have sexually abused her?

A. From the client herself?

Q. Yes.

A. Yes. I did eventually, yes.

[Defense Counsel]: Same objection, your Honor. Calls for hearsay.

[Prosecutor]: I would like to qualify this witness as an expert, if I could. Would that be all right at this time?

The Court: Yes.

. . .

Q. As part of your diagnosis, then, you learn who this little girl indicated had sexually abused her; is that correct?

A. Yes.

Q. And that was necessary in your diagnosis in this case; is that correct?

A. Yes, it was.

Q. And who was that person or persons?

A. David Dye, and then she was the-he was the first one that she revealed to me that inappropriately touched her and sexually abused her, and later on, it-she indicated that Brandy [Large] was involved as well.

. . .

Q. And this little girl reported that her mother had sexually abused her. Was there any undue influence on this little girl at this time?

A. It was a regular session. We had sessions once or twice a week, and this information came out bit by bit from her, and there were no leading questions on my part, just part of therapy.

Ms. Large contends that this testimony reflects both improper vouching for the credibility of JL and an opinion that Ms. Large is guilty. We disagree.

[¶ 13] Ms. Large does not specifically identify the statements in the challenged testimony that she finds objectionable, but we perceive two possible bases for her claim of error. The first is Dr. Gibson's conclusion that JL had been abused. The first question we must answer, then, is whether Dr. Gibson's statement of his diagnosis is permissible. We have previously recognized that "an expert is permitted to state an opinion that someone is a victim of sexual assault but, of course, that expert cannot vouch for the credibility of the victim." *Rivera v. State*, 840 P.2d 933, 939 (Wyo.1992), *abrogated on other grounds by Springfield v. State*, 860 P.2d 435, 442–43 (Wyo.1993); *Hayes v. State*, 935 P.2d 700, 704 (Wyo.1997) ("Because the question of whether a child has been molest-

ed is generally beyond common experience, allowing an expert to testify on the issue assists the trier of fact."). Ms. Large does not dispute that Dr. Gibson was qualified to render expert testimony in this case. His expert testimony related to his diagnosis and was not improper.

[¶ 14] The second question is whether Dr. Gibson's testimony regarding JL's statements that she was abused by Ms. Large was admissible. We employ a two-part test for determining the admissibility of a patient's identification of the offender in sexual abuse cases: 1) the declarant's motive must be consistent with the purposes of promoting treatment or diagnosis; and 2) the content of the disclosure must be that reasonably relied on by the expert. *Stephens v. State*, 774 P.2d 60, 72 (Wyo.1989); *Betzle v. State*, 847 P.2d 1010, 1015–19 (Wyo.1993). The two-part test was met in Ms. Large's case. Notably, Dr. Gibson was called in to treat JL, rather than to perform a forensic evaluation. There is no indication that JL's motive was anything other than to receive treatment. There is also clear foundation in the record that JL's identification of the perpetrators of her abuse was a necessary part of Dr. Gibson's diagnosis and treatment. This testimony was not erroneously admitted.

[¶ 15] The second challenged portion of Dr. Gibson's testimony is more troubling:

Q. [By the prosecution]: Do you have a duty to report sexual abuse if you believe it's occurring?

A. I do.

Q. Did you do that in this particular case?

A. I did. Yes, I did.

Q. And who are the persons that you indicated possibly perpetrated this sexual abuse?

A. David Dye and Brandy Large.

Ms. Large asserts that Dr. Gibson opined as to her guilt in this exchange.

[¶ 16] Dr. Gibson's testimony is very similar to testimony that we have held to be improper in other cases. In *Stephens*, three expert witnesses provided opinions of Mr.

Stephens's guilt over defense objections. 774 P.2d at 65–66. In one instance the prosecutor asked a school counselor, "Based on your sessions with [the victim] and talking to him, do you have an opinion as to who the perpetrator is?" *Id.* at 65. The witness responded, "Based on the fact that I have seen him for a year-and-a-half and that he has not changed who has done it to him, I would say that it was his father, [Mr. Stephens]." *Id.* The prosecutor also asked a licensed clinical social worker, "Do you have an opinion about who this [illicit sexual] contact has been with?" *Id.* at 66. The social worker responded, over defense objection, "He shares with me that it was daddy Bill [Mr. Stephens]." *Id.* We determined that this testimony, and that of the third witness who testified similarly, constituted an impermissible opinion of guilt. *Id.* at 68.

[¶ 17] The State contends that the testimony does not rise to the level of opinion of guilt testimony. The initial question implicates only Dr. Gibson's opinion regarding whether sexual abuse was occurring. Presumably the "duty" referred to by the prosecutor relates to Wyo. Stat. Ann. § 14–3–205(a), which requires "[a]ny person who knows or has reasonable cause to believe or suspect that a child has been abused . . . [to] immediately report it to the child protective agency [DFS] or local law enforcement agency." Standing alone, this testimony does not run afoul of the prohibition against opinion of guilt testimony. It does not provide an opinion regarding the perpetrator of the abuse and is potentially relevant as context for the investigation.

[¶ 18] Dr. Gibson's identification of Ms. Large as one of the perpetrators of the abuse is a different matter, however. On one hand, the overall tenor of the questioning promotes the conclusion that Dr. Gibson held an opinion that Ms. Large was guilty of abusing JL. On the other, the prosecutor's use of the word "possibly" in his question seeking identification from Dr. Gibson may have been sufficient to avoid violation of the prohibition against opinion of guilt testimony. In evaluating the testimony, however, we cannot ignore the prosecutor's closing argument. In his argument, the prosecutor stated:

And Dr. Gibson, you've heard his testimony, taking a look at the allegations of sexual abuse, not only by David Dye, but Brandy Large, did report to the Department of Family Services that he believed sexual abuse had occurred, that abuse had occurred at the hands of Brandy Large and David Dye.

In light of this argument, we must conclude that the challenged testimony was an improper prosecutor-elicited opinion of guilt.

[¶ 19] As mentioned previously, Ms. Large did not object at trial to any of the challenged testimony. We typically apply a plain error standard of review when a defendant fails to assert an objection to the challenged testimony. "This standard requires the alleged error 1) be clearly reflected in the record, 2) be a violation of a clear and unequivocal, not merely arguable, rule of law, and 3) deny an appellant a substantial right resulting in material prejudice." *Sanderson v. State*, 2007 WY 127, ¶ 16, 165 P.3d 83, 89 (Wyo.2007). Under the "error per se analysis," which Ms. Large contends is the applicable standard, the appellant need not establish prejudice in order to prevail. *See Stephens*, 774 P.2d at 68. For several reasons, we agree with the State that plain error is the appropriate standard and that Ms. Large must demonstrate prejudicial error to prevail on appeal.

[¶ 20] The State contends that Dr. Gibson's testimony is relevant and necessary to counter defense contentions that JL's testimony was "tainted" by "well-meaning folks." There is support in the record for the State's position. As we understand the defense position at trial, certain "well-meaning folks" suggested to JL that she had been molested by her mother, and encouraged JL to make those allegations against her mother. At trial, Ms. Large did not identify those "well-meaning folks" by name, but it is a fair inference from the trial record that Ms. Large included Dr. Gibson as one of them. If so, Dr. Gibson's belief that JL had been molested by her mother would supply a motive for Dr. Gibson to encourage JL to name her mother as one of the perpetrators of the abuse. Indeed, the trial court, in one exchange away from the jury, said that defense

counsel "made the comment that perhaps there was some undue influence or fabrication by the State, and so I think that door was opened there."

[¶ 21] If an objection had been made at trial, the potential relevance of the expert testimony could have been explored. Even if relevant, the trial court could have weighed the potential probative value of the testimony against the danger of unfair prejudice and made a determination as to admissibility which we would have reviewed under an abuse of discretion standard. If the trial court had allowed the testimony, a limiting instruction may also have been appropriate if requested by defense counsel.

[¶ 22] This is precisely what occurred in *Metzger v. State*, where the district court properly instructed the jury after a defense objection. 4 P.3d 901, 905 (Wyo.2000). Using a similar trial strategy to that Ms. Large employed, defense counsel in *Metzger* brought the witness's beliefs about the child victim's credibility into question. On cross-examination, the State explored those beliefs. Because Mr. Metzger objected to the opinion testimony that the prosecutor elicited, the district court was able to consider the evidence and evaluate it within the context of the entire trial. When it did so, the district court gave the jury a limiting instruction. We stated: "Therefore, in view of the 'open door' doctrine and, in particular, in view of the limiting instruction given by the trial court, we conclude that the trial court did not abuse its discretion in permitting the disputed question to be asked and answered." *Id.* at 906. *See also McClelland v. State*, 2007 WY 57, ¶ 32, 155 P.3d 1013, 1023 (Wyo.2007) (The district court sustained defense objections and ordered the challenged response stricken from the record. "Given these remedial efforts of the district court [sustaining defense objections and ordering challenged response stricken], we decline to categorize this incident as error."). In Ms. Large's case, however, the district court had no opportunity to address this issue because Ms. Large never objected. Given the overall defense strategy, Ms. Large's failure to object to the testimony may simply have been a trial tactic. Under such circumstances, it is difficult to conclude that an error per se approach to Dr. Gibson's testimony is appropriate.

[¶ 23] As a general principle, the choice between the plain error standard and the error per se standard depends upon whether the error is a "structural" error or a "trial" error. The United States Supreme Court first examined this distinction in *Arizona v. Fulminante*, 499 U.S. 279, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991). In *Fulminante*, the criminal defendant protested the State's use of his confession, which he claimed was coerced. 499 U.S. at 282, 111 S.Ct. at 1250. One issue before the Court was whether admission of a coerced confession is subject to a harmless-error analysis. *Id.*, 499 U.S. at 307–12, 111 S.Ct. at 1263–66.

[¶ 24] The Court reviewed prior decisions in which it had held that a criminal defendant need not show prejudice on appeal. For example, total deprivation of trial counsel in violation of *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963), and lack of an impartial judge in violation of *Tumey v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) were both circumstances requiring reversal without evaluating prejudice to the defendant. *Fulminante*, 499 U.S. at 309, 111 S.Ct. at 1265. The Court noted that "[t]he entire conduct of the trial from beginning to end is obviously affected by the absence of counsel for a criminal defendant, just as it is by the presence on the bench of a judge who is not impartial." *Id.*, 499 U.S. at 309–10, 111 S.Ct. at 1265. Other errors that were reversible without a showing of prejudice included "unlawful exclusion of members of the defendant's race from a grand jury, *Vasquez v. Hillery*, 474 U.S. 254[, 106 S.Ct. 617, 88 L.Ed.2d 598] (1986); violation of the right to self-representation at trial, *McKaskle v. Wiggins*, 465 U.S. 168, 177–178, n. 8[, 104 S.Ct. 944, 950–951, n. 8, 79 L.Ed.2d 122] (1984); and violation of the right to public trial, *Waller v. Georgia*, 467 U.S. 39, [49–50, n. 9, 104 S.Ct. 2210, 2217, n. 9, 81 L.Ed.2d 31] (1984)." *Fulminante*, 499 U.S. at 310, 111 S.Ct. at 1265.

[¶ 25] The important common factor in cases applying an error per se standard, according to the Court, was that "[e]ach of

these constitutional deprivations is a similar structural defect affecting the framework within which the trial proceeds, rather than simply an error in the trial process itself." *Id.* In *Fulminante*, in contrast, the Court held that introducing an involuntary confession was a "trial" error, not a "structural" error, and therefore introducing the confession was not reversible per se. *Id.* Notably, the Court pointed out that admitting an involuntary confession was not "the type of error which 'transcends the criminal process.'" *Id.*, 499 U.S. at 311, 111 S.Ct. at 1265. The distinction between structural and trial error has also been adopted by several states. *E.g., Berry v. State*, 282 Ga. 376, 651 S.E.2d 1 (2007); *State v. Frost*, 160 Wash.2d 765, 161 P.3d 361 (2007); *State v. Langley*, 958 So.2d 1160 (La.2007); *Arteaga–Lansaw v. People*, 159 P.3d 107 (Colo.2007).

[¶ 26] We first applied an error per se standard to opinions of guilt in *Stephens*, 774 P.2d 60. The defendant in *Stephens* was charged with taking immoral or indecent liberties with his minor son. 774 P.2d at 62. During the trial, the prosecutor asked three forensic experts whether they thought the victim had been sexually abused. All three responded in the affirmative. *Id.* at 65–66. The prosecutor also asked two of the three witnesses who they believed had assaulted the victim, and they indicated it was the defendant. We found that their testimony constituted an impermissible opinion of guilt because an expert's testimony of an accused's guilt is not helpful to the jury and encourages the jury to abdicate its responsibility to properly adjudicate the case. *Id.* at 67. Subsequent cases maintained the rule that testimony of guilt is improper. *E.g., Bennett v. State*, 794 P.2d 879, 881 (Wyo.1990); *Whiteplume v. State*, 841 P.2d 1332, 1338 (Wyo. 1992). Of particular significance here, *Stephens* established that "testimony offering an opinion as to the guilt of the defendant, when elicited by a prosecuting attorney, should be perceived as error per se." 774 P.2d at 68.

[¶ 27] Our later decisions narrowed this rule by holding that the error per se standard was appropriate only when the prosecutor elicited the improper testimony. If the witness spontaneously offered an opinion of an accused's guilt, we applied either a harmless or plain error standard of review, depending on whether the defendant objected to the testimony. In *Whiteplume*, for example, the prosecutor did not elicit an opinion of guilt, but simply asked a testifying police officer the question, "What did you do next?" 841 P.2d at 1339. The officer volunteered that he had made a "determination that [the victim] had been raped." *Id.* Because "the prosecution did not ask the direct question," we did not apply the error per se rule, but instead considered whether the defendant suffered prejudice as a result of the officer's opinion testimony. *Id.* We ultimately reversed the conviction because "a reasonable possibility exist[ed] that, [without the testimony], the verdict might have been more favorable to appellant." *Id.* at 1341. We later commented:

> Since *Whiteplume*, our review of issues concerning opinion testimony has developed the following rules. We apply an error-per-se standard when a prosecutor has improperly elicited an opinion of either defendant's guilt or the truthfulness of a witness. *Taylor v. State*, 2001 WY 13, ¶ 21, 17 P.3d 715, ¶ 21 (Wyo.2001). When the prosecutor's question is not a signal for the witness's credibility-opinion-testimony and defense counsel did not object at trial the plain error standard, not the per se error standard, applies. *Dudley v. State*, 951 P.2d 1176, 1178–79 (Wyo.1998). When a prosecutor does not seek an opinion but an investigating officer's testimony supplies one, we review the record to determine if the officer is implying that he believed or held an opinion with respect to the victim's version of the events surrounding the assault. *Whiteplume*, 841 P.2d at 1339–40. If the officer intended to impliedly vouch for the truth of the victim's accusations, no corroborating evidence exists, and the central jury issue is the victim's credibility, we will find reversible error when our review of all of the circumstances demonstrates prejudice to the extent that our confidence in the verdict is undermined. *Id.* at 1340–41; *Dudley*, 951 P.2d at 1180.

*Mitchell v. State*, 2003 WY 160, ¶ 11, 81 P.3d 180, 183 (Wyo.2003).

[¶ 28] Neither *Stephens* nor any subsequent decisions involving opinions of guilt considered whether the error was structural or trial error. Considering that distinction here, the conclusion is inescapable that opinion of guilt testimony is not a structural error, but a trial error to which an error per se standard should not apply. This conclusion is consistent with our prior cases applying a plain error analysis when the testimony has not been elicited by the prosecution. If the error is "structural," it should not matter how the testimony was elicited. If, for example, Dr. Gibson had testified: "I concluded that Ms. Large abused JL," the conviction would be reversed automatically if the prosecutor's question elicited the testimony. But the same statement in response to an innocent question such as, "What did you do next?" would not be error per se. In each case, the jury would hear precisely the same answer. The only difference in the two situations is the prosecutor's question.

[¶ 29] Our conclusion that opinion of guilt testimony is not a structural error does not completely resolve the question of whether an error per se approach is appropriate. Our prior decisions applied different standards of review depending on whether the testimony was elicited by the prosecutor. This suggests that prosecutorial misconduct was a factor in establishing error per se as the standard of review. In examining claims of prosecutorial misconduct, we typically require an appellant to demonstrate prejudice in order to prevail. *E.g., Talley v. State*, 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo. 2007); *Dysthe v. State*, 2003 WY 20, ¶ 23, 63 P.3d 875, 884 (Wyo.2003). In at least one area of repeated prosecutorial misconduct, however, we imposed an error per se rule as a deterrent:

> Since we overruled *Clenin v. State*, Wyo., 573 P.2d 844 (1978) in *Richter v. State*, Wyo., 642 P.2d 1269 (1982), where we held that such violations were not necessarily prejudicial and, under some fact situations, constitute harmless error, our attention has been called to far too many instances where prosecutors seem to be playing "Russian roulette" with this impermissible practice. The game seems to be that prosecutors will take the chance and ask

> about or comment upon silence even though they know that these interrogations are impermissible as being in violation of the defendant's Fifth Amendment rights to the federal constitution and his Art. 1, § 11, Wyoming constitutional rights [against forced self incrimination]-on the theory that the Supreme Court in all probability will hold the error to be harmless. No more.

> We herewith return to the rule of *Clenin v. State*, supra, and will hold that any comment upon the accused's exercise of his or her right to remain silent is prejudicial error which will entitle the accused to a reversal of the conviction.

*Westmark v. State*, 693 P.2d 220, 221–22 (Wyo.1984) (footnotes omitted). Although we have previously applied an error per se analysis to prosecutor-elicited opinions of guilt, we have never done so because of a perceived need to curb prosecutorial misconduct in this specific area. We perceive no such need now.

[¶ 30] In summary, we find there is no proper basis for applying an error per se standard of review to prosecutor-elicited opinions of guilt. While it may be error to admit an opinion of guilt, it is trial error rather than structural error. That remains true whether or not the prosecutor elicits the opinion. It is unnecessary to apply an error per se standard as a deterrent to repeated prosecutorial misconduct. Accordingly, we will no longer treat a prosecutor-elicited opinion of guilt as error per se. To the extent this conflicts with our holding in *Stephens*, we hereby overrule *Stephens*.

[¶ 31] Because Ms. Large did not object to the trial testimony she now claims should not have been admitted, we review for plain error. *E.g., Talley*, ¶ 9, 153 P.3d at 260. "This standard requires the alleged error 1) be clearly reflected in the record, 2) be a violation of a clear and unequivocal, not merely arguable, rule of law, and 3) deny an appellant a substantial right resulting in material prejudice." *Sanderson*, ¶ 16, 165 P.3d at 89. Finding plain error is an exceptional circumstance. "The 'plain-error' doctrine will be applied only where the error seriously

affects the fairness or integrity of judicial proceedings." *Jones v. State*, 580 P.2d 1150, 1153 (Wyo.1978).

 [¶ 32] In Ms. Large's case, the alleged error is clearly reflected in the record, and we have determined that Dr. Gibson's testimony constituted an improper opinion of Ms. Large's guilt. Nevertheless, when viewed in context of the entire record, Dr. Gibson's opinion testimony was harmless. Given all of the evidence introduced against Ms. Large at trial, there is no reasonable possibility that the verdict might have been more favorable to her in the absence of the challenged testimony. There is no dispute that JL was sexually abused, and she testified that Ms. Large was one of the perpetrators. This testimony was corroborated by Mr. Dye and by ML. Under the circumstances, Ms. Large has not established that Dr. Gibson's opinion of guilt testimony was prejudicial. Accordingly, we do not find plain error.

### Ms. England's Testimony

 [¶ 33] Ms. Large also claims that three portions of Ms. England's testimony constituted improper vouching. The first section of Ms. England's testimony that Ms. Large claims is plain error is from the prosecution's direct examination concerning Ms. England's diagnosis that JL suffered from Reactive Attachment Disorder (RAD):

Q. Which of those [RAD symptoms] do you recall that [JL] has?

A. [JL]—the primary thing that [JL] has is the control, the control issues, ... she's very accepting of strangers. She's—she can be very clingy with a person that she doesn't know well. She's perfectly willing to go off with whoever comes along. At the same time, she's very guarded and defensive and distrustful of people that normally a child might trust. She's—she is very guarded with caretakers. She's very guarded with people that—that she would be expected to trust. She doesn't trust them. She—she lies, but she's not a good liar. She's—she's obvious in her lies, and—and it's pretty easy to get her

to—to acknowledge that something is a lie, but she does lie.

The second is the following cross-examination testimony elicited by defense counsel from Ms. England:

Q. You indicated, did you not, that one of the characteristics of someone who has [RAD] is lying?

A. Yes.

 . . .

Q. Is it possible if people from [DFS] or law enforcement personnel or prosecutors meet with children and discuss their sexual abuse that those children might come to perceive that that's what they think is important about them?

A. If it was ongoing. See, that's the thing with my relationship with [JL]. I am with the child two, three, four times a week.

Q. I'm not asking—

A. It—it—if a law enforcement person interviewed her once or twice, that's not an ongoing relationship, and it would be less likely to have that effect.

Q. But is it possible? What would be possible?

A. I suppose it would be possible.

Q. And wouldn't it also be possible that if that's the case, she might tell a number of different things in order to get their favor if what you just indicated was correct?

A. Well, I'm not entirely sure what you indicated is correct, but—but sure, you know, if you reinforce something, if you reinforce a behavior, you're going to see more of it. [JL] is not a good liar. She's not a kid who can sustain a story or a lie. She will lie, but she's not a kid who can sustain it. She's not a kid who can keep it up and—and be consistent in her presentation of the lie.

Q. Is that an obvious thing? I mean, anyone who's around her on a regular basis would be able to tell if she's lying or not, at least in your opinion?

A. Anyone who is around her on a regular basis, I would—I would say begins to pick up on when she's lying, yeah. She

telegraphs it. Plus, she responds to being asked to tell the truth.

And, finally, Ms. Large objects to Ms. England's testimony elicited by the prosecutor during re-direct examination:

Q. Why can't [JL] lie well?

A. [JL]'s intellectual functioning is not—she is not—she does not fall in the average range of intellectual functioning. She falls in the lower part of the borderline range . . . so the—part of the reason is that—that she doesn't have the intellectual capability of sustaining a lie over time. She doesn't—she doesn't remember what—what she said or quite how she said it or what details she put into it, and so she'll tell you one thing one time, and the next time it's significantly different.

And the other thing is that if you confront her with it, "[JL], that's just not true," her eyes drop, and if you are patient and you wait her out, she'll usually tell you what is true.

Q. [Defense counsel] is alleging that a variety of people got together and encouraged people to lie. [Overruled objection] Are you aware of any people who have encouraged [JL] to lie?

A. I am not.

Q. Have you encouraged her to lie?

A. Certainly not.

Q. What have you encouraged her to do?

A. I've encouraged her to trust, learn to—learn to trust adults, and I've encouraged her to take it on faith that adults will behave toward her in a trustworthy manner. It's very hard for her.

[¶ 34] Ms. England, in her testimony, did not improperly vouch for JL's credibility. Ms. England related her diagnosis and the foundations for that diagnosis. Furthermore, as the excerpts show, Ms. England's reference to JL's lying behavior was initially quite brief, and it was defense counsel who attempted to capitalize on what might be considered useful impeachment material. By doing so, the door was opened, and we can see nothing improper in the prosecutor's treatment of the issue on re-direct examination. Consequently, there is no plain error in the admission of Ms. England's testimony.

**Inadmissible Hearsay**

[¶ 35] In Ms. Large's final appellate issue, she objects to testimony of Ms. Harmon and the prosecutor's investigator, Randy Bingham, to the extent that they testified about their interactions with JL and ML. Both witnesses repeated statements made by JL and ML in those interactions. Ms. Large claims on appeal that Ms. Harmon's and Mr. Bingham's testimony constituted hearsay and, consequently, was inadmissible. Ms. Large made no objection to this testimony at trial, thus we will review her claims for plain error.

[¶ 36] We agree with the State that these statements are not hearsay under W.R.E. 801(d)(1)(B), which states:

A statement is not hearsay if: . . . The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is . . . consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive.

[¶ 37] We have previously listed four elements that determine whether W.R.E. 801(d)(1)(B) applies: "(1) The declarant testifies at trial; (2) the declarant is subject to cross-examination concerning the prior statement; (3) the prior statement is consistent with the declarant's trial testimony; and (4) the prior statement is offered to rebut an express or implied charge against the declarant of recent fabrication or improper influence or motive." *Martin v. State*, 2007 WY 76, ¶ 26, 157 P.3d 923, 929 (Wyo.2007). When evaluating the cross-examination requirement, we have previously allowed testimony under W.R.E. 801(d)(1)(B) even when "counsel for the defense studiously avoided cross-examining most witnesses and deferred his opening statement until after the State had presented its case." *Alicea v. State*, 13 P.3d 693, 698 (Wyo.2000). We also do not require, under the third element, that a declarant testify, point-by-point, to every detail in the prior statements. *See id.* at 699. For example, in *Alicea* we held that the testimo-

ny of the child witnesses satisfied this requirement, although the later adult testimony contained considerably more detail. *Id.*

[¶ 38] The first requirement is easily met: JL and ML testified at trial. The second is also met because Ms. Large had an opportunity to cross-examine JL and ML, even though she chose not to take that opportunity with JL, and only briefly cross-examined ML. The third requirement is satisfied as well. In spite of Ms. Large's contention that the trial testimony did not precisely mirror the out-of-court statements, it is not necessary that the witness do so. JL had described both instances of abuse and said that Ms. Large actively participated in them. She also testified that the three of them—JL, Mr. Dye, and Ms. Large—were unclothed during the incidents. ML testified that he had seen Mr. Dye, Ms. Large, and JL unclothed in the living room, and described what they were doing. In fact, their testimony was quite similar to that in *Alicea,* noted above. The children's testimony met the third element and was sufficient to render the testimony of the foster mother and the investigator admissible under W.R.E. 801(d)(1)(B).

[¶ 39] As for the fourth element, the record shows that the prior statements were in fact offered to rebut explicit charges of improper influence. Defense counsel claimed from the opening statement that the children had been influenced to tell false stories about Ms. Large's involvement: "[W]hat I suggest the evidence will show is not so much that they helped the children open up to speak of these horrendous acts, but that these well-meaning folks actually helped create the story that they're now reporting." Defense counsel consistently pursued this strategy throughout opening statement,[2] in the cross-examination of witnesses,[3] and in closing argument.[4]

[¶ 40] The record leaves little doubt in our minds that the defense theory throughout the trial was that the children had been improperly influenced to make false accusations. Because the *record* establishes that all four elements required to apply W.R.E. 801(d)(1)(B) are met in this case, the trial court did not violate any clear and unequivocal rule of law when it allowed this testimony. As a result, we can find no plain error.

[¶ 41] Affirmed.

---

2. "[W]hat it takes [to get the children to disclose] are leading questions and basically rewarding them when they tell the story that the State wants you to hear."

3. "Is it possible if people ... meet with children and discuss their sexual abuse that those children might come to perceive that that's what they think is important about them?"

4. "On every occasion ... [JL] would respond to indicate that she had been sexually abused after being confronted about misbehavior at school or elsewhere or when it was possible that she might be leaving [the foster home]."