BURKE, Justice.
[¶1] Darren Dumas challenges his convictions for strangulation of a household member and domestic battery. He claims the district court erred in admitting victim impact evidence, an opinion as to his guilt, and evidence vouching for the credibility of the victim. We conclude that Mr. Dumas has failed to demonstrate plain error, and we affirm.
ISSUES
[¶2] Mr. Dumas presents a single issue which we will address as three separate issues:
1. Did the district court commit plain error in allowing the State to present improper victim impact testimony?
2. Did the district court commit plain error in allowing a witness to express an opinion that Mr. Dumas was guilty?
*451 3. Did the district court commit plain error in permitting a witness to vouch for the credibility of the victim?
FACTS
[¶3] Ms. Dumas and Mr. Dumas met when they were neighbors in Evansville, Wyoming, in 2012. They developed a friendly relationship. They maintained contact after Ms. Dumas moved to Alabama in 2014, and their friendship developed into a relationship that was as "romantic as it could be for long distance." They decided Ms. Dumas would move back to Wyoming so they "could make a go of it." She returned to Wyoming in July of 2015, and moved in with Mr. Dumas at his home in Thermopolis, Wyoming. Nine days later, they married.
[¶4] The relationship soon soured, and by June of 2016, "[t]here was a lot more bickering, arguing, [and they] didn't really see eye to eye on a lot of things." One source of friction was a group of friends who stayed at their home as roommates for a time. Mr. Dumas claimed that when the roommates moved out, they stole "stuff" from him. On Friday, September 23, 2016, Mr. Dumas accused Ms. Dumas of cheating, lying, "and being in cahoots" with the former roommates. She tried to show him messages on her tablet computer to refute his claims. Mr. Dumas took the tablet and "smashed it" on Ms. Dumas's head and "shattered the screen." She then tried to show him messages from her cell phone, but he "smashed" that on the dresser. When the two continued to argue, Mr. Dumas grabbed her by the throat and pushed her up against the wall. She found it hard to breathe, and "saw stars briefly."
[¶5] The next day, Ms. Dumas reached out to the Hope Agency,[1] and employees there arranged a place for her to stay. Before she left home, however, she wrote two letters to Mr. Dumas saying that she still loved him, did not want to get divorced, and would do whatever she had to do to make the marriage work. She left one letter in the kitchen and the other in their bedroom. She did not report the previous day's incident to law enforcement.
[¶6] On Monday, September 26, 2016, Ms. Dumas returned to the house to collect some of her belongings, believing that Mr. Dumas would not be there. However, at around six o'clock in the evening, Mr. Dumas arrived home with his stepmother and her three grandchildren. Ms. Dumas went outside to talk to him, but "of course it escalated into an argument." She testified that, when they went into the house, he pushed her up against a cabinet, then grabbed her wrist with both of his hands and twisted her skin in opposite directions. Mr. Dumas insisted that Ms. Dumas had to babysit the grandchildren. They moved into the bedroom to avoid fighting in front of the children, and she told him she did not want to babysit. He grabbed her hair, hit her, and "cupped" her ears.
[¶7] Ms. Dumas stayed with the children when Mr. Dumas and his stepmother left. Mr. Dumas returned after about thirty-five minutes. Ms. Dumas suggested that she would leave since he was there to watch the children, but he insisted that she stay to care for the children because he was going to bed. The argument escalated, and Mr. Dumas struck her in the face, told her he did not want to talk with her, that their relationship was over, and he did not want anything to do with her. When she tried to "hug him good-bye," he pushed her away, then grabbed her by the throat. According to Ms. Dumas, "He squeezed, told me it was over, told me to leave him alone, and it apparently sunk in, because I left that time. And like I said, that was the last time I saw him." Ms. Dumas testified that it was difficult to breathe while his hands were on her, and that it was "like being trapped underwater gasping for air." She had difficulty swallowing for about a month.
[¶8] The next morning, Ms. Dumas went to the Hope Agency to report what had happened. Agency staff called the Thermopolis police, and Officer Bobbi Zupan was dispatched to the Hope Agency. The officer observed redness and bruising on Ms. Dumas's face and arms, and because Ms. Dumas reported being choked or strangled, the officer *452 advised her to go to the emergency room for a medical examination. The hospital nurse observed Ms. Dumas's injuries, including petechiae[2] on her neck. The doctor noted that Ms. Dumas appeared to have three recent injuries: a bruise on her upper left arm, a bruise on her left forearm, and swelling behind the ear.
[¶9] Mr. Dumas was arrested and charged with one count of strangulation of a household member in violation of Wyo. Stat. Ann. § 6-2-509(a)(i) (LexisNexis 2015) and one count of domestic battery in violation of Wyo. Stat. Ann. § 6-2-511(a). He was found guilty on both counts and sentenced to a prison term of two to five years for the strangulation and a concurrent jail term of 180 days for domestic battery. Mr. Dumas then filed this appeal.
STANDARD OF REVIEW
[¶10] Mr. Dumas did not object at trial to any of the evidence he challenges on appeal. Accordingly, we review for plain error. Carroll v. State , 2015 WY 87, ¶ 11, 352 P.3d 251, 254 (Wyo. 2015).
To establish plain error, the appellant must show 1) the record clearly reflects the incident urged as error; 2) a violation of a clear and unequivocal rule of law; and 3) that he was materially prejudiced by the denial of a substantial right. Causey v. State , 2009 WY 111, ¶ 18, 215 P.3d 287, 293 (Wyo. 2009).
Carroll , ¶ 11, 352 P.3d at 255 (quoting Masias v. State , 2010 WY 81, ¶ 20, 233 P.3d 944, 950 (Wyo. 2010) ).
DISCUSSION
I. Victim Impact Evidence
[¶11] Mr. Dumas contends the State presented improper victim impact evidence during the testimony of Janic Bartlow. Ms. Bartlow was the last witness called by the State. She is an employee of the Hope Agency. She testified in general about the Hope Agency, the services it offers to victims of domestic violence, and her duties there. She testified about her interactions with Ms. Dumas and her observations of Ms. Dumas on September 27th. She described Ms. Dumas as "very distraught, crying." She observed bruises. Ms. Dumas was "shaking." She took Ms. Dumas to the hospital and, after Ms. Dumas had been examined and treated, she drove her back to the Hope Agency. Ms. Bartlow also testified as to the additional assistance that Hope Agency provided to Ms. Dumas. It provided Ms. Dumas initial shelter for three days and also paid the initial deposit and rent for six months for an apartment that Ms. Dumas obtained in a different town. The agency provided food for Ms. Dumas, allowed her to take some clothing from the agency's "emergency" supply, and filled the gas tank of her car.
[¶12] Mr. Dumas contends that Ms. Bartlow's testimony about the assistance provided by the Hope Agency after her return from the hospital was "not of consequence to the determination of whether Mr. Dumas assaulted his wife," and was therefore irrelevant and inadmissible. He claims that this testimony "served only to inflame the passions of the jury and constitute[d] impermissible victim impact testimony." The State contends that the evidence was not intended to inflame the passions of the jury and that Mr. Dumas's trial strategy rendered the challenged testimony relevant. Based upon our review of the record, we agree with the State.
[¶13] "Broadly speaking, victim impact evidence is that evidence relating to the victim's personal characteristics and to the physical, emotional, or social impact of a crime on its victim and the victim's family." Benjamin v. State , 2011 WY 147, ¶ 56, 264 P.3d 1, 14 (Wyo. 2011) (quoting Sweet v. State , 2010 WY 87, ¶ 41, 234 P.3d 1193, 1207 (Wyo. 2010) ). See also Olsen v. State , 2003 WY 46, ¶ 151, 67 P.3d 536, 592 (Wyo. 2003) (citing Payne v. Tennessee , 501 U.S. 808, 817, 111 S.Ct. 2597, 2604, 115 L.Ed.2d 720 (1991) ). When evidence of a crime's impact on a victim "is absolutely irrelevant with *453 respect to the issues before the jury," and the only purpose must have been to attempt to arouse the passions of the jury, then the "admission of such evidence is error, and the trial courts are cautioned not to permit such evidence to be presented unless there is a clear justification of relevance." Justice v. State , 775 P.2d 1002, 1010-11 (Wyo. 1989). We have recognized, however, that:
Victim impact testimony may or may not be admissible. Thomas v. State , 2009 WY 92, ¶ 7, 211 P.3d 509, 511-12 (Wyo. 2009). "The key inquiry on the admissibility of victim impact testimony during the guilt phase of a criminal trial is relevancy." White v. State , 2003 WY 163, ¶ 13, 80 P.3d 642, 649 (Wyo. 2003) ; Justice v. State , 775 P.2d 1002, 1011 (Wyo. 1989) ; McCone v. State , 866 P.2d 740, 751 (Wyo. 1993). "Such testimony may be irrelevant if offered ... as proof of the victim's loss; the physical, emotional, or psychological impact on the victim; or the effect upon the family. Yet it may be relevant if offered for other purposes." White , ¶ 13, 80 P.3d at 649.
Schreibvogel v. State , 2010 WY 45, ¶ 22, 228 P.3d 874, 883 (Wyo. 2010).
[¶14] Initially, we would observe that the challenged testimony does not appear to be of such a nature that it would be likely to "arouse the passions of the jury." There was no embellishment or description of the shelter or apartment where Ms. Dumas stayed. The testimony could also properly be viewed as a clarification of previous testimony.
[¶15] Near the beginning of her testimony, Ms. Bartlow testified in general to the services offered by Hope Agency to victims of domestic violence. She explained that Hope Agency is "able to offer them shelter for three nights, and we pick up that tab. We'll also take them and get food so that they can eat while they are in shelter." She also testified that "if the person [has] the ability to move into another apartment" that the transitional housing program would "pay" for that for "up to 2 years in support of that victim." That testimony was received without objection and is not challenged on appeal. The testimony at issue could properly be viewed as mere clarification of the specific services provided to Ms. Dumas. The evidence is also relevant in light of the defense strategy at trial.
[¶16] The defense strategy focused primarily upon the credibility of Ms. Dumas. The defense took the position that Ms. Dumas had fabricated her story. She did so, according to defense counsel's opening statement, because Mr. Dumas wanted a divorce and she "was not ready for this relationship to end." She was jealous because "she believed that Mr. Dumas had feelings for another woman." Near the conclusion of her opening statement, defense counsel succinctly summarized the case: "What you are going to hear is the old adage, 'If I can't have you no one will, and if you leave me, you will pay.' Ms. Dumas told these stories due to Mr. Dumas'[s] request to end the relationship, and she figured if she couldn't have him, no one was going to."
[¶17] There were several aspects to the defense attack on Ms. Dumas's credibility during trial. The defense claimed that Ms. Dumas had failed to provide a consistent narrative of the events. During opening statement, defense counsel told the jury, "From this point of the story you are going to hear many different versions of Ms. Dumas'[s] tale. Her story was reduced to writing in three different reports, none of which are consistent."
[¶18] The defense also attempted to undermine Ms. Dumas's credibility by emphasizing her relationship with the Hope Agency. The defense suggested that Ms. Dumas reported the domestic violence to the Hope Agency in order to obtain financial support and because the Hope Agency would believe her. During voir dire , defense counsel directly linked the attack on Ms. Dumas's credibility to the services offered by the Hope Agency, asking the jury this question: "So we talked about the Hope Agency and how the resources can make it easier to report because you know they are there for you. Who believes it can also make it easier for a false report if someone knows where to go?" In response, one prospective juror observed that "the Hope Agency provided a lot of services; food, clothes, toys, different stuff, so somebody could lie just to get a free handout." When *454 another prospective juror agreed with the first, defense counsel asked, "And do you think that having an agency like the Hope Agency that gives out free rooms and free food and free toys sometimes adds an incentive [to lie]?" The prospective juror agreed, "Sometimes." A third juror responded: "I saw a couple instances in the military where spouses were exaggerating on what they had for meals and what not to try to get more money out of the military."
[¶19] During cross-examination of Ms. Dumas, defense counsel attempted to establish that Ms. Dumas was aware that the Hope Agency provided resources to help victims of domestic violence:
Q: ... You volunteered at the Hope Agency; correct?
A: I did. They helped me, I helped them.
Q: So you knew what resources they had?
A: We never really talked about that, no.
Q: Did you - you knew they could help you; correct?
A: I knew that they helped with domestic violence, but when I met them I wasn't domestic violence, I was just a person.
Q: Correct. So on - on the weekend, even the entire month of September, you knew the resources the Hope Agency had; correct?
A: I - I didn't know what extent their resources were. I knew that they helped people, I knew they provided food, I knew they did fund raisers, I didn't know exactly what that operation entailed, because that's not why I was there.
Q: But you did volunteer with them and you knew about the program?
A: I helped wrap presents, I baked cookies, I mean again, I was not part of what the Hope Agency did.
Q: Okay. But you knew they had resources to help domestic violence?
[Prosecutor]: Your Honor, I am going to object, it's been asked and answered numerous times.
THE COURT: Sustained.
[¶20] Not only did defense counsel not object to the testimony of Ms. Bartlow at issue in this appeal, she emphasized it during cross-examination:
Q: Okay. And just to recap, for 6 months you provided housing for Ms. Dumas; correct?
A: Yes, ma'am.
Q: And food and clothes?
A: We didn't provide food continually those 6 months, we provided it at first because she's unemployed.
She also highlighted it during her closing argument:
Now we all have our roles to play in our community. We all have our jobs. The Hope Agency's job is to be there for victims, and they do a great job of that. We saw in this case they gave her 6 months of free rent and the deposit, gas, food, clothes.
[¶21] The key question in evaluating the admissibility of evidence that may be construed as victim impact evidence is its relevance. Schreibvogel , ¶ 22, 228 P.3d at 883. In this case, the defense raised the prospect that the availability of free services from the Hope Agency provided a motive for Ms. Dumas to make a false report. The evidence was directly related to the credibility of Ms. Dumas. Evidence bearing on the credibility of a witness is relevant. Barnes v. State , 858 P.2d 522, 534 (Wyo. 1993) ; Smith v. State , 2005 WY 113, ¶ 18, 119 P.3d 411, 417 (Wyo. 2005) ; Schreibvogel , ¶ 22, 228 P.3d at 883. See also W.R.E. 607 ("The credibility of a witness may be attacked by any party ...."). Because the evidence was relevant, there was no violation of a clear and unequivocal rule of law and Mr. Dumas has failed to establish plain error.
II. Opinion of Guilt
[¶22] In his second and third issues, Mr. Dumas contends the State presented testimony from Ms. Bartlow that provided an opinion of guilt of Mr. Dumas and vouched for the credibility of Ms. Dumas. Because Mr. Dumas did not object to the testimony, we review for plain error. The specific testimony that is now challenged was presented near the end of the prosecutor's redirect *455 examination of Ms. Bartlow. The testimony is brief:
Q: In the 2 and a half years that you have been an advocate for the Hope Agency, I assume that you've seen your share of all types of people come through the door?
A: Yes, ma'am.
Q: And does the agency serve men and women?
A: We serve men and women both, yes, ma'am.
Q: And during your time as an advocate for the Hope Agency, have you ever come across a person who has made a report and then come to find out it really didn't happen?
A: No, ma'am.
Q: Any reason, while you were dealing with Ms. Dumas, to believe that the incidents that she was reporting weren't as she reported them?
A: No, ma'am, absolutely none.
Because the testimony is clearly reflected in the record, Mr. Dumas has satisfied the first prong of the plain error test.
[¶23] We agree with Mr. Dumas that there is a clear and unequivocal rule of law prohibiting testimony that provides an opinion about a defendant's guilt or vouches for the credibility of a witness.
This court has consistently held that it is the jury's function to resolve the factual issues, determine the credibility of the witnesses, and decide the guilt or innocence of a criminal defendant. Huff v. State , 992 P.2d 1071, 1079 (Wyo. 1999). This is because jurors are deemed to be experts in determining the credibility of the witnesses. Stephens v. State , 774 P.2d 60, 68 (Wyo. 1989).[3 ]
Two rules flow from the Wyoming cases that have addressed th[ese] issue[s]. First, the prosecution may not elicit opinion testimony from a witness, lay or expert, concerning the guilt of the accused. Bennett v. State , 794 P.2d 879, 881 (Wyo. 1990) ; Stephens [v. State ], 774 P.2d [60,] 66 [ (Wyo. 1989) ]. Second, the prosecution may not elicit an expert witness' opinion with regard to another witness' credibility. Stephens , 774 P.2d at 68. These rules ensure that it is the jury which resolves the factual issues, judges the credibility of the witnesses, and ultimately determines the guilt or innocence of the accused. Wells v. State , 846 P.2d 589, 596 (Wyo. 1992), denial of habeas corpus aff'd , 37 F.3d 1510 (10th Cir. 1994).
Gayler v. State , 957 P.2d 855, 860 (Wyo. 1998). Our review of our case law on this issue, however, has reminded us that we must carefully analyze the testimony to determine whether a given comment by one witness actually vouched for another witness' credibility or commented on the defendant's guilt. Huff , 992 P.2d at 1079 ; see Gayler , 957 P.2d at 860 and Brown v. State , 953 P.2d 1170, 1182 (Wyo. 1998) (for cases where this court did carefully analyze the challenged testimony).
Ogden v. State , 2001 WY 109, ¶ 21, 34 P.3d 271, 276 (Wyo. 2001). Although this passage refers only to testimony from an expert witness, we have clarified that "it is impermissible for either a lay witness or an expert to vouch for the credibility of another witness, or to comment on the guilt of the accused." Drury v. State , 2008 WY 130, ¶ 10, 194 P.3d 1017, 1020 (Wyo. 2008).
[¶24] The State does not dispute that improper opinion of guilt and vouching testimony is prohibited. It contends, however, that the challenged testimony does not provide an opinion of guilt or amount to improper vouching for the credibility of Ms. Dumas. The State also asserts that, even if the testimony was improper, Mr. Dumas has failed to establish prejudice.
[¶25] In order to qualify as an opinion regarding the guilt or innocence of a defendant, the testimony must constitute an "actual conclusion about the guilt or innocence of the accused party." Ogden , ¶ 23, 34 P.3d at 277. A witness may interpret the evidence "even though that interpretation may be important *456 in establishing an element of the crime and thus leading to the inference of guilt," without violating the rule. Id. (quoting Saldana v. State , 846 P.2d 604, 616 (Wyo. 1993) ). In Whiteplume v. State , this Court found that a highly-experienced deputy sheriff offered an opinion of guilt when he testified that, after listening to the victim's story, he had "made a determination that she had been raped." Id. , 841 P.2d 1332, 1337 (Wyo. 1992) (emphasis omitted). In Bennett v. State , we also concluded that the investigating officer offered an opinion of guilt when he stated that he believed that the defendant "was a drug dealer" and the ultimate source of cocaine purchased in controlled buys. Id. , 794 P.2d at 882. Similarly, in Carter v. State , we determined that a special agent offered an opinion of guilt when he summarized the evidence against the defendant and stated, "I would find that indicative of a drug dealer." Id. , 2012 WY 109, ¶ 10, 282 P.3d 167, 170 (Wyo. 2012). When asked if he had any doubt about that conclusion, the agent replied, "No." Id.
[¶26] In contrast, this Court held in Evenson v. State that an investigating officer did not offer an opinion of guilt. Id. , 2008 WY 24, ¶¶ 8, 177 P.3d 819, 823-24 (Wyo. 2008). The State charged Mr. Evenson with aggravated assault. Id. , ¶¶ 3-6, 177 P.3d at 822. At trial, the investigating officer testified, "Once we were able to determine exactly who the individual was that was responsible for the assault, we tried to locate that individual who would be Mr. Evenson[.]" Id. , ¶ 8, 177 P.3d at 823. On appeal, Mr. Evenson argued that the officer had testified that he was guilty. Id. In contrast to our decisions in Whiteplume , Bennett , and Carter , however, we held that the officer had not offered an opinion of guilt, reasoning that "[b]eing 'responsible for the assault' is not the equivalent of being 'guilty of aggravated assault.' " Evenson , ¶ 10, 177 P.3d at 823.
[¶27] We reach a similar conclusion in this case. Ms. Bartlow's testimony did not contain an actual conclusion of guilt. Instead, she commented that she had no reason to disbelieve Ms. Dumas's version of events. She did not mention Mr. Dumas or directly reference the charged conduct in the challenged testimony. In Saldana , this Court distinguished direct opinions of guilt from witness testimony that merely supported an "inference of guilt." Id. , 846 P.2d at 616-17. At most, Ms. Bartlow's statements fell into the latter category. In the absence of an actual conclusion of Mr. Dumas's guilt, Ms. Bartlow's testimony did not violate a clear and unequivocal rule of law.
III. Vouching
[¶28] Mr. Dumas also contends that the challenged testimony violates the prohibition against vouching for the credibility of a witness. The State contends that "in context" the testimony is not improper. As we understand it, the State is asserting that Mr. Dumas opened the door for the testimony based upon his theory of defense and questions that he had asked Ms. Bartlow on cross-examination. The State contends that the issue of Hope Agency's belief in its clients was introduced by Mr. Dumas during voir dire , elicited by Mr. Dumas during cross-examination of Ms. Bartlow, and emphasized by Mr. Dumas in closing argument in an effort to undermine the credibility of Ms. Dumas. The State asserts that the brief exchange with Ms. Bartlow during redirect was warranted by that strategy. Also, as previously mentioned, the State contends that Mr. Dumas has failed to establish that he was prejudiced by the testimony, even if it was improper. In light of the defense strategy in this case and its reliance on the evidence to undermine the credibility of Ms. Dumas, we are unable to find any prejudice to Mr. Dumas. Consequently, it is not necessary to determine whether the defense "opened the door" for this testimony.
[¶29] In order to establish plain error, an appellant must show a reasonable probability that he would have received a more favorable verdict in the absence of the error. Osterling v. State , 2018 WY 95, ¶ 7, 424 P.3d 250, 252 (Wyo. 2018). The testimony that is challenged was, in many respects, cumulative. It was consistent with testimony that had been elicited by the State during direct examination of Ms. Bartlow. It also aligned with Ms. Bartlow's testimony during cross-examination by defense counsel.
*457 [¶30] On direct examination, Ms. Bartlow testified that in her job, "the largest thing that we offer is belief. When a client comes in, we believe, period. We don't blame the victim, we try to ascertain what that victim is going through, if that victim is in a safe place, if not, we can provide a safe place." During cross-examination, this exchange occurred:
Q. And you said that your first and biggest priority is to believe; correct?
A: Yes, ma'am.
Q: So you don't really question the sincerity of a victim; correct?
A: We're not the police, it is not ours to question the details.
The State did not emphasize or refer to the testimony during closing, but Mr. Dumas did. During closing, defense counsel told the jury:
She had to have some players in this plan. First of all the Hope Agency. She knew exactly where to go and report because she had been volunteering there, and she knew what they did. And Ms. Bartlow indicated to you what that was; they believe. They never question the story. This is common throughout the story with the players involved.
[¶31] Later in her argument, defense counsel reminded the jury:
Now we all have our roles to play in our community. We all have our jobs. The Hope Agency's job is to be there for victims, and they do a great job of that. ... They're a great resource for people who need it, and they did their job. They believed her without question.
[¶32] In sum, the testimony of Ms. Bartlow was very brief, was not emphasized by the State, and was consistent with testimony that had previously been given by Ms. Bartlow and elicited by Mr. Dumas during cross-examination. The testimony was utilized by Mr. Dumas in his efforts to undermine the credibility of Ms. Dumas and supported his theory of defense. Under the circumstances, we see no reasonable probability that the jury would have returned a more favorable verdict in the absence of the disputed testimony. Mr. Dumas has failed to demonstrate plain error.
[¶33] Affirmed.

The Hope Agency offers various services to victims of domestic violence.

Petechiae"are little red dots that appear on the skin as the result of burst capillaries and are commonly caused by strangulation." Davis v. State , 2017 WY 147, ¶ 7 n.1, 406 P.3d 1233, 1235 n.1 (Wyo. 2017).

Stephens has been overruled on other grounds by Large v. State , 2008 WY 22, ¶ 30, 177 P.3d 807, 816 (Wyo. 2008).